MEMPHIS KEELEY INSTITUTE et al. v. LESLIE E. KEELEY CO.

(Circuit Court of Appeals, Sixth Circuit. July 20, 1907.)

No. 1,619.

1. TRADE-MARKS AND TRADE-NAMES—UNFAIR COMPETITION—RIGHT TO PROTECTION—MISREPRESENTATION BY PLAINTIFF—EVIDENCE.

Evidence considered, and *held* to establish the contention that the complainant, which was the manufacturer and proprietor of a secret remedy which it sold and used for the treatment and cure of the opium, liquor, and tobacco habits, and which it claimed and represented to the public as having as its chief and most valuable ingredient chloride of gold or "double chloride of gold," was chargeable with fraudulent misrepresentations, in that such remedy did not contain any gold or chloride of gold.

[Ed. Note.—Unfair competition, see notes to Scheuer v. Muller, 20 C. C. A. 165; Lare v. Harper & Bros., 30 C. C. A. 376.]

2. SAME—EFFECT—FRAUDULENT REPRESENTATIONS.

The proprietor of a medicine or remedy made in accordance with a secret formula, which knowingly makes false and fraudulent representations as to the ingredients of such remedy to the public through its advertisements and labels, cannot maintain a suit in equity to protect its

business of selling or administering such remedy from invasion and injury by another.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trade-Marks and Trade-Names, § 94.]

3. SAME—PLEADING.

That a complainant comes into a court of equity with unclean hands, in that he is chargeable with fraudulent misrepresentations to the public in respect to the subject-matter of the suit, is not, strictly speaking, a defense, and need not be pleaded, but, upon such fact appearing, it will be given effect by the court in the interest of the public by refusing to grant relief to the complainant.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trade-Marks and Trade-Names, § 103.]

Appeal from the Circuit Court of the United States for the Western District of Tennessee.

For former opinion, see 144 Fed. 628.

C. W. Metcalf, for appellants.

T. E. Barry, for appellee.

Before SEVERENS and RICHARDS. Circuit Judges, and COCHRAN, District Judge.

COCHRAN, District Judge. This is the second appeal of this case. The first appeal was dismissed, and the opinion then delivered is reported in 144 Fed. 628. A reading thereof will disclose the ground of the dismissal and the nature of the controversy involved in the case. In brief, the first appeal was dismissed because the decree appealed from was not final. It was a partial dismissal of the bill. It did not dismiss the bill entirely, but only one branch of the controversy raised by it, and that a subordinate one. On the return of the cause to the lower court, it disposed of the whole controversy by a final decree. It receded from the position taken on the former hearing that the contracts between the appellee and the appellant Memphis Keeley Institute had been abandoned and rescinded before suit brought, because of which said partial dismissal of the bill, to wit, in so far as it sought a cancellation of said contracts, was made, and granted appellee the full relief which it sought. It enjoined the appellants from claiming that they had a right to, and were, in fact, administering Keeley remedies at the Memphis Keeley Institute, and adjudged a cancellation of said contracts and delivery up to appellee of the Keeley remedies in possession of the appellants on their being reimbursed the price paid for same. It is from this decree that this appeal is taken.

The main ground upon which appellants claim that the decree of the lower court should be reversed is that the appellee did not come into that court with clean hands, and therefore was not entitled to the relief it sought and that was granted to it. The position that it did not so come into court is undertaken to be maintained in this way. The business in which the appellee is engaged, to wit, administering, and selling to be administered, what are known as "Keeley remedies" for the opium, liquor, and tobacco habits and neurasthenia, and which was sought to be, and by the decree is, protected from injury and invasion by appellants, has been built up and is being maintained by

certain fraudulent misrepresentations. This position was urged on the lower court, and it was claimed that because of it the bill should be dismissed. But it refused to so hold and, as stated, granted appellee full relief. This it did for two reasons: One was that the evidence did not establish the position that appellee's business had been built up and was being maintained by any such misrepresentations. The other was that, even if it did, that fact was not against appellee's right to relief. We will dispose of these two reasons in the order stated. The alleged fraudulent misrepresentations relied on are quite numerous. The main one is that gold is the principal ingredient and effective agent in said remedies. We will limit our consideration to this alleged fraudulent misrepresentation, because we are constrained to hold that the claim of appellants in regard thereto is made good by the evidence.

It is not disputed that appellee represents to the public that gold is the principal ingredient and effective agent in its remedies. So distinct, repeated, and emphatic has been and is its representation to this effect that it must be held that its business has been built up and is being maintained by this representation. The name which it has given its remedies, and by which they are known, is the "Double Chloride of Gold Cure." There is no such substance as the "Double Chloride of Gold." There is a chloride of gold and a chloride of sodium. The claim was that these two substances were ingredients of the remedies, and to voice the claim the short form, of "Double Chloride of Gold" was adopted. It was intended to designate that the remedies contained the two chlorides of gold and sodium. This name is printed upon the labels on the bottles containing the remedies, and is used in the circulars and other means used to advertise the business. The remedy for neurasthenia is called "Gold Neurotine." To emphasize the claim as to the existence of gold in the remedies and its importance, the prominent portion of the lettering on the labels on the bottles is in gold. They contain a picture of the globe with a belt around it encircled by the words, "We belt the world," and on the belt are these words, "Gold cure for opium habit, gold cure for drunkenness, gold cure for neurasthenia, gold cure for tobacco habit"—all in gold. The labels contain this statement, to wit:

"Gold is especially beneficial in its action on the mental forces. It gives the patient courage, hope, and renewed will power; and is the only medical agent that will effectually and forever relieve all craving or necessity for alcohol in any form. The remedy can in no way act injuriously on the patient."

And users are cautioned to break the bottle when empty to prevent its re-use for the sale of "spurious Gold Cure Mixtures."

In a circular or pamphlet issued by the appellee, under the name of Dr. Leslie E. Keeley, it is said:

"There is some criticism regarding my method of cure. The principal drug I use in the cure of drunkenness, the chloride of gold and sodium, or the double chloride of gold, is known throughout civilization."

Again:

"I come now to speak of my discovery of the Double Chloride of Gold in the treatment of the disease—the specific cure for drunkenness or alcoholism.

The pathology of the disease being understood, the indications for the gold remedies is a rational one, and not empirical. The action of gold as a medicine is primarily upon the higher cerebral nerve centers, the very seat of diseased will, and of the mania for strong drink."

Again:

"The Keeley treatment consists of remedies and solutions (with the Double Chloride of Gold as a basis)."

And again:

"Many remedies have been proposed and tried with some good results and many vexatious failures, but the most effective agent yet employed is gold."

In a pamphlet so issued entitled, "A Keeley Cure Catechism," amongst others, are the following questions and answers, to wit:

"Q. What is his remedy?
"A. With the Chloride of Gold and Sodium (the Double Chloride of Gold as a basis) he has compounded the best reconstructive nerve tonic in existence.
"Q. But does he not heal all alike?
"A. No, to quote his own words, 'the principal drug I use in the cure of drunkenness is the Double Chloride of Gold.'"

In a pamphlet so issued entitled, "Neurasthenia or Nerve Exhaustion; Its Treatment and Cure," is this statement:

"For the condition of the system, reason, as well as science, would indicate a remedy which will have a direct and positive effect upon the nerve centers. Such an agent is found in the Double Chloride of Gold. The remarkable therapeutical virtues of gold have long been known, but its scientific and accurate application has not been understood by the profession and hence its disuse. By the special method of preparation employed by Dr. Leslie E. Keeley, the Double Chloride of Gold has become the great ethical agent which, acting promptly upon the nerve centers, gives to the worn out and diseased system renewed health, activity, and life."

The sole question at issue in regard to this representation is as to whether it is a misrepresentation and fraudulent; i. e., intended to mislead and deceive the public. If it is untrue and known to be so, the rest follows.

The record contains positive evidence to the effect that it is untrue and known to be so. It contains no affirmative evidence that the representation is true. The appellee has contented itself with the position that the appellants have failed to make good that it is a fraudulent misrepresentation. And the case hangs here on the correctness of this position. That positive evidence consists of the testimony of a former partner of Dr. Leslie E. Keeley, and, according to his testimony, the originator jointly with Dr. Keeley of the remedies and the business, and of an analytical chemist, to whom certain bottles purporting to contain the remedies were submitted for analysis, pending this litigation. The witness first referred to is named Frederick B. Hargraves. Before his connection with Dr. Keeley, he had been a preacher in the Wesleyan Methodist Church in England, and afterwards in the Presbyterian Church, and then a lawyer. At the time when that connection began, he was state lecturer for the Illinois State Temperance League, and when he gave his testimony his occupation was that of a traveling salesman. In the spring of 1880, when both he and

Dr. Keeley were living in Dwight, Ill., each noticed independently of the other a suggestion in the same newspaper as to a remedy for the cure of drunkenness. In talking about a mutual friend who was addicted to drunkenness, this common knowledge became known to each. Subsequently Dr. Keeley told him that he had used the remedy and gotten good results from it. Hargraves doubted it, and the doctor said the matter could be easily demonstrated—that he would get Pat Conafry, a well known saloon keeper at Dwight, to take the remedy and test it, as Pat would take anything he asked him to take. The doctor fixed up a bottle, and gave it to Conafry, and in a few days he lost his desire for liquor, and could not drink any at the end of about a week. He made strong efforts to drink again, and one Sunday got a drink to stick and became gloriously drunk, and would not take any more medicine. The test, however, was sufficient for Hargraves, and that was the origin, as he terms it, of the "cure business." At first Dr. Keeley refused to become known in the matter, but shortly afterwards the medicine was used with good result on one Major John P. Campbell, of Lexington, Ky., then residing at Dwight, and thereupon the three, Keeley, Hargraves, and Campbell, embarked in the business under the firm name of "Leslie E. Keeley, M. D." Not long after this Campbell went out of the business, and on June 1, 1881, a partnership, with the same firm name, was formed between Keeley, Hargraves, and three others, to wit, John R. Oughton, a drug clerk, one Major C. J. Judd, and Father James Halpin, a Catholic priest, all living at Dwight; the interest of Keeley being three-tenths, and of Hargraves two-tenths, and the remaining five-tenths being divided amongst the other three. The partnership was evidenced by written articles. Dr. Keeley was the dominating spirit of the firm. He had general control of the business, the determination of the duties to be performed by the working partners, being all the others except Halpin, the fixing of their wages, and the power if any partner violated the terms of the agreement, or failed to perform his duties properly, or to conduct himself in a gentlemanly or becoming manner, to terminate his connection with the business. He, however, did not push himself to the front otherwise than in the firm name. He would say:

"I am the big spider in the back office. Always throw a little mystery around me; keep me in the background."

Oughton prepared the remedies and Hargraves was the correspondent and literary man—the advertiser—or, as he styled himself, the general publicity man. He designed the bottles, got up the labels, and prepared the literature by which the remedies and business was advertised. He wrote the partnership agreement. He continued his connection with the business until March, 1886, when he was forced to sell out because of a severe criticism of Judd for something he had done.

This history of the business, and Hargraves' connection therewith, is gathered from his testimony, and, so far as the nature of the last partnership is concerned, is confirmed, by a copy of the articles filed as an exhibit. His testimony also covered the subject as to whether there was any gold in the remedies used in the business. He testified

that he knew the formula by which those remedies were prepared, and that they contained no gold whatever. As bearing on that subject are the following facts testified to by him: Whilst he, Keeley, and Campbell were running the business, they treated a sewing machine agent named Dalliba, at Bloomington, Ill., for the liquor habit, probably the third patient; the other two being Conafry and Campbell. For the first time they administered to him chloride of gold and sodium in form of pills, except once when it was administered in powdered shape. They did not know especially what effect gold would have, and they used it as an experiment. The remedy they had was a tonic remedy, and was only a sobering up process. They had to have something better than that as a specific for the liquor habit. The gold remedy came near killing the patient, and they had to stop it. It was never used afterwards. They hit on a remedy that did all that they expected the gold to do, and was a far more valuable specific for drunkenness than gold, and they used it in its place. Keeley often said to Hargraves, "What a lucky thing we happened to hit upon that drug," as it saved further experiment, and was not dangerous. The remedy, however, has always been called the "Double Chloride of Gold Cure," as they had intended to use gold at the start.

It seems that the medical profession regard gold in certain forms to be beneficial to mental forces, and it is sometimes prescribed for that purpose. It was not used to any extent as a medicine at that time, but has been used more since. They regarded it as an awfully good name, and Keeley hated to part with it. He claimed that it was an effective name to use—impressive. They reconciled themselves to its use on the idea that there is gold in everything—gold in mud—a trace of gold. Keeley would say: "There is a trace of gold any way in it, and that is enough." They kept up the fiction as to gold by having three or four drams of chloride of gold and sodium in the safe, and showing them to visitors coming to look over the laboratory as samples of the gold and sodium used in the remedies. They were constantly assailed by persons claiming that there was no gold in the remedies. To meet this criticism, one S. T. K. Prime, living near Dwight, who claimed that people generally did not believe there was any gold in them, at their instance came to their laboratory and picked two bottles from the stock prepared for shipment and carried them to Prof. Marriner, a celebrated analytical chemist at Chicago, for analysis. Before Prime did this, Oughton fixed up two bottles with gold in them, and put them in a row that was half full of bottles. They were the last two bottles in the row, and naturally Prime selected those two bottles, as they were the nearest to him and came first to his hand. Of course, Prof. Marriner found gold in the mixture submitted to him, and they obtained a certificate from Prime as to his having selected the bottles from those in the laboratory prepared for shipment, and one from Marriner as to the result of his analysis, and circulated them in the course of the business.

The analytical chemist, whose testimony was introduced in support of the position as to the lack of gold in the Keeley remedies, is Dr. William Krauss, a resident of Memphis, Tenn., where appellants reside and carry on business. He is a physician also, a graduate of

the Baltimore College of Pharmacy, has taught chemistry at the Memphis Medical College, and has been the official chemist of the Tennessee Pharmaceutical Association.  He testified that he analyzed the mixtures in some five or six bottles, purporting to contain Keeley remedies brought to him by the appellant C. B. James, president of the appellant Memphis Keeley Institute and the active litigant on appellants' side in this litigation, a portion of them shortly after the bringing of the suit, which was November 1902, and the rest about a year later, and that none of them contained any gold.  He gave in detail the analysis that he made so that it is capable of being determined whether it was properly made.  The bottles, when brought to him, were sealed and labeled.  They were intact, and bore no evidence of having been tampered with.  He described the bottles and their labels, and they correspond to the description of those containing the regular Keeley remedies.  The bottles, with their remaining contents, were filed as exhibits in the cause.  In the course of his testimony he was asked and answered as follows, to wit:

"Q. Then, doctor, you know there is no gold in the Keeley remedies by reason of the tests which you made?

"A. I am absolutely certain as to that.  Absolutely certain that there is no gold in the Keeley remedies."

As bearing on the genuineness of said bottles so placed in Dr. Krauss' hands for analysis, Dr. Samuel Morrow, physician in charge at the institute of appellants, formerly a physician on appellee's staff at Dwight, and in the employ of various Keeley Institutes throughout the country, testified that on September 30 and October 16, 1901, shortly after appellee gave notice to appellants that it would not furnish any more Keeley remedies, except for patients in line, it made shipments thereof to the appellant Memphis Keeley Institute, invoices of which were exhibited, that the appellant C. B. James reserved out of these shipments a package of each kind of remedy for analysis, and locked them in a desk, properly sealed and labeled as they arrived there, and that he afterwards saw him remove these bottles from the desk and heard him say that he was going to take them to Dr. Krauss for analysis.  The appellant C. B. James did not testify in the case at all, and hence gave no testimony touching the genuineness of the bottles which he furnished Dr. Krauss for analysis.

Such, then, is the positive and direct evidence in the record tending to show that appellee's remedies contain no gold.  The evidence of neither of those witnesses is contradicted in any particular, nor has any affirmative evidence been introduced tending to show that said remedies do contain gold.  As stated, appellee's position here is simply that this positive and direct testimony comes short of establishing that said remedies do not contain gold.

It undertakes to meet Dr. Krauss' testimony by the claim that there is no evidence that the remedies which he analyzed were genuine Keeley remedies.  This evidence is lacking, it is urged, because the appellant C. B. James did not take the stand and testify that the bottles which he furnished Dr. Krauss were genuine Keeley remedies; i. e., part of the remedies which his institute had received from the appellee.  This is to be accounted for only on the ground that said appel-

lant did not want to commit perjury or admit that they were not genuine.    According to appellee, said appellant was bad and mean enough to commit perjury, but did not have courage to do so.    But can it be truly said that evidence is lacking that said remedies so analyzed were genuine?    We think not.    Dr. Krauss testified that he got the bottles from said appellant, and that they were sealed, intact, and bore no evidence of having been tampered with.

Dr. Morrow testified that said appellant took out of a shipment of remedies by appellee certain bottles for analysis, locked them in a desk properly sealed and labeled as they had arrived and afterwards took them therefrom, saying that he was going to deliver them to Dr. Krauss for analysis.    It is true that between the time of putting the bottles in the desk and taking them out again, or after taking them out, appellant may have substituted spurious remedies.    But there is no evidence that he did, and, in the absence of such evidence, the presumption of fair dealing must be permitted to negative the idea that there was any substitution.    The mere fact that said appellant did not testify that there had been no substitution cannot be twisted into evidence that there had been substitution.    It is a weakening circumstance, but it can be given no such effect as this.    That appellants had genuine Keeley remedies which they might have turned over to Dr. Krauss for analysis is charged in the bill, and part of the relief sought therein was a delivery of them up to appellee on reimbursement being made of the price paid for them.

Then, as to Hargraves' testimony, the only way in which it is met is by the claim that it is unreasonable to believe that he knew the formula by which the Keeley remedies were made.    The basis of this claim as to unreasonableness is that Hargraves was neither a physician nor a chemist; that he was the speechmaker and literary man of the concern, and no part of his duties related to compounding remedies; that, if the secret of the formula was known to each of the partners, there would be nothing to prevent either from going into the business on his own account upon the dissolution of the copartnership, and compounding the remedy and treating patients under the Keeley remedies; and that Dr. Keeley was the important man and controlling and dominant factor in the concern.    We fail to see anything in any of these circumstances to render Hargraves' knowledge of the formula so unreasonable as to require one to hold his sworn statement that he did know the formula to be untrue.    The partnership agreement itself would seem to indicate that he knew it, for it is expressly provided therein that:

"Each member of the firm shall jealously guard all information pertaining to the compounding of said remedies and their constituent parts and elements, and shall under no consideration divulge any information whatever concerning their manufacture to any one whatever."

But Hargraves' testimony is not confined to telling what the formula contained.    It tells of tricks resorted to in order to make the public believe that the remedies contained gold, when, in fact, they did not. In the trick played upon Prime and Prof. Marriner, Oughton, president of the appellee since February 21, 1900, when Dr. Keeley died, was the prominent figure.    He testified as a witness in the case, yet

he was not asked about nor did he testify in regard to this matter. If such tricks were resorted to, they can be accounted for on no other basis than that the remedies did not contain gold. If they had contained gold, they would not have been resorted to. Criticism of Hargraves' testimony, at various points, has been indulged in. We cannot enlarge this opinion to take them up in detail. We have considered them carefully, and find nothing in them to lead us to discredit his testimony. The most that can be said against his testimony is that he was probably a willing, and, possibly, a revengeful witness.

But this is not all the evidence in support of the position that the Keeley remedies contain no gold. There is a circumstance which, if a consideration of the testimony of Hargraves and Krauss left one in a state of doubt on the subject, is sufficient to drive one to the conclusion that this position is correct. Said Oughton, appellee's president, who has done all the chemical work in preparing the remedies in question, and who knows the formula, was put on the stand by appellants. He was asked in regard to the Keeley treatment as to whether it contained gold, and he refused to answer. An extract from his testimony is in these words:

"Q. 164. Is there any gold in this treatment?
"A. I refuse to answer.
"Q. 165. We insist that you do answer.
"A. I still refuse.
"Q. 166. We notify you then that at the hearing we shall insist that there is no gold in the treatment. Do you still refuse to answer?
"A. I still refuse."

It is hard to account for this refusal upon any other basis than that the remedies do not contain gold. It cannot be accounted for on the ground that the formula is a secret, and it was not to be expected that the secret would be disclosed. But, if there is gold in the remedies, in so far the formula is not a secret. For over a quarter of a century appellee has claimed to the public, and emphasized its claim, that its remedies contain gold. An answer to this question would not open up the rest of the formula or the extent of the gold it contained, for so far the formula was a secret. But as to whether there was any gold at all there was no secret as to that if there was gold there. The silence of appellee's president when asked this question must therefore be construed against it.

This brings us to the other reason, why the lower court refused to give any effect to the position that appellee's business had been built up and was being maintained by fraudulent misrepresentations. It was that, even if this was true, it was not against appellee's right to relief. But, before considering just how this was attempted to be made out, it is to be noted that this court has heretofore held that a court of equity should not protect against injury or invasion a business of selling a medicine which has been built up and is being maintained by fraudulent misrepresentations as to its ingredients, and this on the ground that a suitor in equity should come into court with clean hands. This it did in the case of Fig Syrup Co. v. Stearns, 73 Fed. 812, 20 C. C. A. 22, 33 L. R. A. 56. That was a suit by a manufacturer of a liquid laxative medicine, to which he gave the name

"Syrup of Figs" or "Fig Syrup," to enjoin another from interfering with his business by unfair competition. It was held that it was not entitled to the injunction because it falsely and fraudulently represented to the public that the juice of the fig was the important medicinal agent in the composition of the medicine, when, in fact, just a suspicion of fig juice was put into it not for the purpose of affecting its medicinal character or even its flavor, but merely to give a weak support to the statement that the article sold was syrup of figs, and the laxative agent in it was senna. This was so held notwithstanding there was much evidence introduced showing that it was a very useful medicine and prescribed by physicians of high standing. Judge Taft said:

"This is a fraud upon the public. It is true, it may be a harmless humbug to palm off upon the public as syrup of figs what is syrup of senna, but it is nevertheless of such a character that a court of equity will not encourage it by extending any relief to the person who seeks to protect a business which has grown out of and is dependent upon such deceit."

The case was subsequently approved and followed by the Supreme Court in the case of Worden v. California Fig Syrup Co., 187 U. S. 519, 23 Sup. Ct. 161, 47 L. Ed. 282.

The case we have here comes clearly within the holding in these two cases. The ground upon which the lower court held that the fact that appellee's business may have been built up and grown out of fraudulent misrepresentations to the public was not in the way of its right to the relief it sought was substantially this: A dismissal of the bill for that reason would aid the appellants in practicing the very same fraud upon the public that it is claimed that appellee is practicing, and would therefore put the court in an inconsistent position. The way in which it was thought that such a dismissal would have this effect was that it would amount to an adjudication that the appellant Memphis Keeley Institute had a valid subsisting contract with appellee, and thereby enable it to obtain remedies from appellee to administer to patients. But such a dismissal could not possibly have any such effect. It would not be an adjudication as to the rights of the parties as between themselves. It would be a direct refusal to make any such adjudication. And a court of equity will not aid a plaintiff who comes before it with unclean hands, even though by not doing so it deprives itself of the opportunity to prevent the defendant from doing the unclean thing, and thus may be said to indirectly aid the defendant in so doing. In the Fig Syrup Case the defendant was taking plaintiff's business by unfair competition, and was practicing the very same fraud on the public, because of which the court refused to aid plaintiff, yet the court did not stop him from so doing by granting plaintiff injunctive relief, but turned the plaintiff out of court.

Counsel for appellee cites and relies on a number of cases which hold that a court of equity will not turn out of court an unclean man, or a man who has done an unclean thing which has no relation to the thing which it is sought to have protected by its decree. But such decisions have no application here. The uncleanness here has to do with the very thing which the court is asked to protect and prevent from injury and invasion by appellants. The appellee claims to have

the right to administer and to sell for administration, in the state of Tennessee, its Keeley remedies, and that appellants are injuring that right and invading its business by asserting that it has the right to and is in fact administering such remedies at the Memphis Institute, and asks the court to protect its right and business from such injury and invasion by enjoining appellants from so claiming, canceling the contracts, and requiring a delivery up of the remedies held by appellant. But that business—the very thing which the court is asked to protect—is, as we have held, unclean in the particular stated. Hence it is a clear case within the rule that a court of equity will not aid one who comes before it with unclean hands.

It should be noted, however, though it is not relied on either by the lower court or by appellee's counsel here, that the fact in regard to appellee's fraudulent misrepresentations, as we have adjudged it, was not set up by appellants in their answer as a defense to the suit. This presents the question whether, in the absence of its having been so presented, any effect can be given to it. It seems to be well settled that such a matter need not be pleaded as a defense to the suit. If it appears from the record, it will be given effect notwithstanding it has not been pleaded. The theory upon which this is done is that in reality it is not a matter of defense. It is given effect to, not on defendant's account, but because of the public. As said by the Supreme Court of Tennessee in the case of Simmons Med. Co. v. Drug Co., 93 Tenn. 99, 23 S. W. 169:

"It is not strictly speaking a defense at all, but rather an interposition by the court to discourage fraud and wrong upon the public."

The following decisions lend support to and uphold this doctrine: Fetridge v. Wells, 13 How. Prac. (N. Y.) 385; Cardoze v. Swift, 113 Mass. 250; Dunham v. Presby, 120 Mass. 285; Connell v. Reed, 128 Mass. 477, 35 Am. Rep. 397; Teoli v. Nordrill, 23 R. I. 87, 49 Atl. 489; Mass. Nat. Bank v. Shine, 163 N. Y. 360, 57 N. E. 611.

In view of the holding that we have made as to this matter, it is not necessary that we consider any other question raised and discussed on the appeal.

We feel constrained, therefore, to adjudge that the decree of the lower court be reversed, and the cause remanded thereto, with directions to dismiss the bill.