**LEO FEIST, Inc., v. YOUNG and four other cases.**

Nos. 167, 247, 248, 252, 273.

District Court, E. D. Wisconsin.

Aug. 25, 1942.

E. S. Hartman, of Chicago, Ill., and Robert A. Hess, of Milwaukee, Wis., for plaintiffs.

Wright & Mayer, of Milwaukee, Wis., for defendants Wiley Young and Theodore Suszka.

Winter & Koehler, and Orville S. Luckenbach, all of Shawano, Wis., for defendant Victor Felts.

Jacob S. Rothstein, of Milwaukee, Wis., for defendant Joseph Molitor.

Patrick A. Dewane, of Manitowoc, Wis., for defendant Joe Pekel.

SCHWELLENBACH, District Judge.

By stipulation these cases were consolidated for trial. In each instance the plaintiffs, who are the owners of copyrights of certain popular songs, seek under title 17 U.S.C.A. § 25 to enjoin the defendants from infringement of their copyrights and each seeks damages in the sum of $250. The defendants all reside in the State of Wisconsin and each of them operates a tavern at which liquor or food is dispensed and music is played for the enjoyment of the guests. While in some of the cases effort was made to contest plaintiffs' testimony, the evidence in each case, coupled with the stipulations filed in some, proves conclusively that the defendants did, on the dates alleged in the various complaints without being licensed so to do by the copyright owners, play the copyrighted pieces named in such complaints. Prior to the commencement of each of the actions, each defendant received notification from the plaintiffs' agent that unless he desisted from making public use of the copyrighted music, action would be commenced for injunction and damages. The testimony shows that each of these plaintiffs is a member of the unincorporated association known as the American Society of Composers, Authors and Publishers (Ascap). Since 1927 Ascap has maintained an office in the City of Milwaukee, Wisconsin. Robert A. Hess is its representative within the State of Wisconsin. The arrangement made between these publisher plaintiffs and some 1,500 other composers, authors and publishers of copyrighted musical works is that each transfers and assigns over to Ascap the nondramatic public performance rights in and to the musical compositions copyrighted by such member. Ascap exists by virtue of the laws of the State of New York and its principal place of business is in the City of New York. Ascap has the exclusive right, under its agreements with its members, to license to any individual or corporation engaged in providing entertainment, upon payment of royalties in accordance with rates established by it, the right to publicly perform for profit the copyrighted musical works the licensing rights to which have been assigned to Ascap. The procedure used in the State of Wisconsin is that Mr. Hess has a small crew of solicitors and investigators who visit the various establishments where music is played for profit and, in those instances where music, the licensing rights to which have been assigned to Ascap, is played, they attempt to negotiate a licensing contract with the offending establishment proprietor. A regular series of form letters is sent out. Success in the negotiation of a contract results in the fixing of the license charges to be paid by the establishment upon the basis of a national formula promulgated in New York. Mr. Hess passes upon the correctness of the terms of such contracts, authorizes the agent or solicitor to have the contract signed by the licensee and to collect the first payment of money. This money is deposited in the bank in the name of Ascap at Milwaukee. The actual signature on behalf of Ascap prior to 1935 was affixed by Mr. Hess. After that, the contracts were sent to Chicago for signature. Mr. Hess testified that there had only been two or three cases on which the terms of the contracts approved by him had even been questioned by the Chicago office. Up until 1935, Ascap had its name on the door of Mr. Hess' office in Milwaukee. It was then removed.

However, all of the notices which are sent out to licensees within the State are on Ascap letter heads showing the address of Ascap's Wisconsin office, payments of license fees are made to Ascap in Milwaukee. The official publication of Ascap showing the various offices maintained throughout the United States lists the one in Milwaukee. The contracts are wholly performed in Wisconsin. The solicitors and investigators are employed in Wisconsin, work in Wisconsin and are paid by Ascap in Wisconsin.

While these actions have been commenced in the names of the various plaintiffs, the real party plaintiff is Ascap. That this is true was made clear by the commendable frankness of the witness Hess when called adversely by defendants. He stated he had no connection with these plaintiffs, was never employed by any one of them. He was employed by Ascap to prosecute these actions, the costs were advanced by Ascap, any moneys collected upon the judgments would be retained by Ascap. He testified that *the prime objective of these actions was to enable Ascap to force these defendants and other tavern operators in Wisconsin to sign license agreements with Ascap and to maintain the respect for Ascap and its rights under the copyright law so that others will respect the property rights of Ascap*. He testified that if the court did enter judgment against these defendants, he would make no serious effort to collect the amount of the judgments. He said that he hadn't collected any judgments since 1935. He would use the judgment and decree for the purpose of forcing the defendants to enter into license agreements with Ascap or to stop playing Ascap music.

The defendants rely upon Chapter 177 of the Wisconsin statutes for their defenses in these cases. That statute, adopted in 1935 and amended in 1937, is printed in its entirety in the footnotes.[1] It is a tax statute which requires any person, firm, asso-

---

[1] "Chapter 177.
"Copyrighted Music.
"177.01 Music brokers.
"177.01. Music Brokers. (1) No person, firm, association or corporation, other than the true or original composer, shall, either directly or indirectly, issue licenses, or other agreements, for the public rendition of copyrighted musical numbers by persons within this state unless said person, firm, association or corporation shall first obtain a license from the secretary of state to transact such business within this state.

"(2) Any person, firm, association or corporation, other than the true or original composer, desiring to obtain such license, shall file with the secretary of state a true copy of the articles of association, partnership, incorporation or organization, whichever the case may be, together with a verified statement showing:

"(a) The names, salaries or compensation [of] its officers, agents and/or assignees.

"(b) The titles of the musical numbers owned, controlled or otherwise held by him or it.

"(c) The rates to be charged users thereof, and the basis therefor.

"(d) If assignees, the purchase price, or other agreement between the true or original composers and him or it.

"(e) The total gross receipts received by him or it for the preceding year.

"(f) The total disbursements made by him or it during the preceding year, and to whom and for what such disbursements were made.

"(3) At the time of filing said verified statement, each person, firm, association or corporation, other than the true or original composer, shall pay to the secretary of state a franchise tax equivalent to twenty-five per cent of his or its entire gross receipts from persons within this state for or on account of licenses or other agreements for the public rendition of copyrighted musical numbers within this state for the preceding year. The secretary of state shall thereupon issue to the applicant a license to transact such business in the state. Such license shall expire on the thirty-first day of December of each year and may be renewed by the payment of such franchise tax and the filing of the copy and verified statement referred to in subsection (2) of this section.

"(4) Any person, firm, association or corporation who shall request the playing of any copyrighted musical number, in any public place, with intent and for the purpose of making such rendition a basis for an infringement suit against the proprietor thereof, or any other person; or who shall, without first obtaining the necessary license therefor, attempt, by threats of suit, or other means, either oral or in writing, to compel persons in this state to purchase licenses for the rendition of musical numbers shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be punished by a fine of five hundred dollars for each of-

ciation or corporation other than the true or original composer of a copyrighted musical number which seeks to issue licenses for the public rendition of such numbers first to obtain a license from the State of Wisconsin, to file certain information with the Secretary of State, and to pay a tax equal to 25 per cent of the gross revenue received by it from such licenses in the State of Wisconsin. Violation is declared to be a misdemeanor punishable by fine. It also requires investigators employed by such persons, firms or composers to be licensed. Failure to comply with this provision is also a misdemeanor punishable by fine. Defendants' excuse for failure to secure licensing agreements from the plaintiffs was that neither the plaintiffs nor Ascap had complied with Chapter 177 and they feared that they might be charged with violation of the Wisconsin conspiracy statute, Wisc. Stat. 348.40, should they enter into such license agreements. They each asked for injunctive relief to prevent the plaintiffs from interfering with their rendition of copyrighted music. They asked this relief not only for themselves but for all persons in Wisconsin in a situation similar to theirs.

Defensively, the defendants advance three propositions:

■ First, that they are under the restraint of fear of violation of the state conspiracy statute and, therefore, justified in declining to negotiate contracts with Ascap. I cannot accept this contention. It is inconceivable to me that the court should hold that a person is justified in violating a Federal statute because of fear that if he complies with it he will violate a State statute. These defendants are under no compulsion to operate taverns. If, in order successfully to operate taverns, they must need violate a Federal law, it ill behooves them to complain that such violation is justified because of their apparent distaste for violating a State law.

■ Second, defendants contend that plaintiffs have been guilty of abuse of process. They urge that because plaintiffs admit their motive in the institution and prosecution of these suits is not the collection of the damages or the enforcement of the injunction that this constitutes such abuse of process as to prevent recovery. I see little merit in this argument. The motive, open or secret, which impels a litigant to seek the assistance of the court is not important as to the outcome so long as he has a legal and moral right upon which to sue. Connolly v. Union Sewer Pipe Company, 184 U.S. 540, 22 S.Ct. 431, 46 L.Ed. 679; Sullivan v. Collins, 107 Wis. 291, 83 N.W. 310; 1 Corpus Juris, 971; 1 C.J.S., Actions, § 24.

■ Third, defendants' third contention is that these plaintiffs enter a court of equity with unclean hands. This for the reason that they admit that they have

---

fense, and in addition thereto, upon the application of any person interested therein, any court of competent jurisdiction may issue injunctions restraining such acts or practices.

"(5) No person, except the actual composer thereof, shall engage in whole or in part in the business or occupation of obtaining, or hold himself or herself out as one who can obtain, information concerning, or in anywise engage in the investigation of, public rendition of copyrighted musical numbers by persons within this state without first obtaining a license so to do from the secretary of state.

"(6) Any person seeking to act as investigator or to engage in such business or occupation, either in whole or in part, shall file a written application with the secretary of state setting forth the applicant's name, residence, former and present occupation, employer's name, names of copyright owner or owners for whom information is sought, the basis and rate of remuneration, if any, for such employment or services and any oth-

er information as the secretary of state may require or deem necessary to properly carry out the intents and purposes of subsections (5), (6) and (7) of this section. Upon the filing of the application and the payment of the license fee of twenty dollars, the secretary of state shall issue to the applicant a license for the period ending the thirty-first day of December of the year of the making of the application. All changes of employers or copyright owners shall, not later than ten days after any change occurs, be reported to the secretary of state.

"(7) Any person violating any provision of subsections (5), (6) and (7) of this section shall be guilty of a misdemeanor and upon conviction thereof, shall be punished by a fine of not less than two hundred dollars nor more than five hundred dollars for each offense. For the purpose of said subsections (5), (6) and (7) each report of a musical number alleged to have been publicly rendered shall be deemed a separate offense."

628

failed even to attempt to comply with Chapter 177 of the Wisconsin statutes. This is an action in equity. 18 C.J.S., Copyright and Literary Property, § 141, p. 254; L. A. Westermann v. Dispatch Printing Co., 6 Cir., 233 F. 609. I agree with plaintiffs' contention that it is not the function of the court of equity to interest itself in the general morals of the suitors who appear before it. The question is whether that lack of cleanliness infects the cause of action upon which the suit is based. One, by his past activities, may have so soiled his hands that "all the perfumes of Arabia could not sweeten" them and still the doors of equity would be open to him. Plaintiffs' counsel have cited many cases in support of this position. With them, I am in full accord. Where plaintiffs err on this point is in their contention that the rule is only applicable when the wrong done affects the defendant or directly prejudices him. That is not the law. A court of equity will not permit itself to be used as an instrumentality by which a party may effectuate a violation of positive law or for the evasion of the requirements of ethics and morality. Mitchell v. Board of Commissioners of Leavenworth County, Kansas, 91 U.S. 206, 208, 23 L.Ed. 302. There the plaintiff worked out a quaint scheme to avoid paying personal property taxes due on March first by converting his money into tax exempt securities on February 28 and reconverting them on March third. He sought the aid of an equity court in his manipulation. The Supreme Court said: "A court of equity will not knowingly use its extraordinary powers to promote any such scheme as this plaintiff devised to escape his proportionate share of the burdens of taxation." Very similar to the facts in this case are those in Bell & Howell Co. v. Bliss, 7 Cir., 262 F. 131, 134. There it was found that the action was commenced in the name of a dummy who had no real interest in the patent involved, who had no voice in the management of the litigation, who never even knew that the suit had been commenced in his name, the purpose of all of which was to hinder and delay a proceeding which was pending in the state court. Concerning such an attempt Judge Evans said: "That this court should not lend itself to such a purpose, or its aid to such a result will, of course, be at once conceded. The complainant, entering a court of equity, must come with clean hands. Nor is this court, as argued by counsel for appellees, limited, in applying this maxim, to a case where the iniquitous action is one of which the moving party may personally complain. The rule thus invoked need not be pleaded at all. In fact, it is not a matter of defense primarily. Courts apply it, not to favor a defendant, but because of the interest of the public; courts act sponte sua. 10 R.C.L. 390." See, also, Memphis Keeley Institute v. Leslie E. Keeley, 6 Cir., 155 F. 964, 84 C.C.A. 112, 16 L.R.A.,N.S., 921; Weegham et al. v. Killifer et al., 6 Cir., 215 F. 289, 131 C.C.A. 558, L.R.A.1915A, 820; Larscheid v. Kittell, 142 Wis. 172, 125 N. W. 442, 20 Ann.Cas. 576.

■ The testimony of Mr. Hess is that the purpose of these suits is to compel these defendants and others to enter into a license agreement with Ascap for the public rendition of copyrighted musical numbers. The Wisconsin statute provides, Chapter 177.01(4): "Any person, firm, association or corporation * * * who shall, without first obtaining the necessary license therefor, attempt, by threats of suit, *or other means,* either oral or in writing, to compel persons in this state to purchase licenses for the rendition of musical numbers shall be deemed guilty of a misdemeanor * * *." (Emphasis mine.) The declared objective of these law suits is in direct contravention with the statutes of the State of Wisconsin. The power of this court will not be used for that purpose.

■ Plaintiffs urge that a refusal of this court to exercise its powers upon their behalf would result in an adjudication sanctioning defendants' violation of the Federal copyright statute. This argument was disposed of by the court in Memphis Keeley Institute v. Keeley, supra [155 F. 973, 84 C.C.A. 112, 16 L.R.A.,N.S., 921], in this language: "But such a dismissal could not possibly have any such effect. It would not be an adjudication as to the rights of the parties as between themselves. It would be a direct refusal to make any such adjudication. And a court of equity will not aid a plaintiff who comes before it with unclean hands, even though by not doing so it deprives itself of the opportunity to prevent the defendant from doing the unclean thing, and thus may be said to indirectly aid the defendant in so doing." The Supreme Court in Worden & Co. v. California Fig Syrup Co., 187 U.S. 516, 519, 23 S.Ct. 161, 47 L.Ed. 282, approved the policy when it approved and followed the

decision of Judge Taft in California Fig-Syrup Co. v. Stearns, 6 Cir., 73 F. 812, 817, 33 L.R.A. 56. There the defendant was taking plaintiff's business by unfair competition and was practising the very same fraud on the public which prevented the equity court from granting plaintiff relief. The fraud practised was characterized by Judge Taft as merely "harmless humbug," yet he said: "That a court of equity will not encourage it by extending any relief to the person who seeks to protect a business which has grown out of, and is dependent upon such deceit." Since the courts have consistently refused to permit their equity powers to be used to sanction acts which come under the mere frown of the law, I cannot permit this court to be used to further a deliberate violation of a statute of the State of Wisconsin.

Nonetheless, plaintiffs ask me to avoid this conclusion on the theory that I should nullify Chapter 177 of the Wisconsin statutes. This for the reason that they contend it does violence to the Federal Constitution. There can be no doubt that Ascap, the real party plaintiff here, is and has been doing business in the State of Wisconsin in such a way as to entitle that State to enact a franchise tax statute, compliance with which is a condition precedent to the transaction of business in the State. International Harvester Company v. Kentucky, 234 U.S. 579, 34 S.Ct. 944, 58 L.Ed. 1479; Eastern Livestock Co-operative Marketing Ass'n, Inc., v. Dickenson, 4 Cir., 107 F.2d 116; Vilter Mfg. Co. v. Rolaff, 8 Cir., 110 F.2d 491; Street Railway Advertising Co. v. Lavo Co. of America, 184 Wis. 395, 198 N.W. 595. A state has the power to levy a tax against corporations or associations transacting business within its borders. State of Wisconsin v. J. C. Penney Co., 311 U.S. 435, 61 S.Ct. 246, 85 L.Ed. 267, 130 A.L.R. 1229. "The state is free to pursue its own fiscal policies, unembarrassed by the Constitution, if by the practical operation of a tax the state has exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred by the fact of being an orderly, civilized society." State of Wisconsin v. J. C. Penney Co., supra, 311 U.S. page 444, 61 S.Ct. page 249. The nullification of legislation on constitutional grounds is a most delicate function not to be indulged in by the court except when compelling considerations leave no other choice. State Tax Commission of Utah v. Aldrich, 62 S.Ct. 1008, 86 L.Ed. ——, 139 A.L.R. 1436, decided April 27, 1942. A tax measured by the gross receipts from the business of licensing others to multiply performances of copyrighted compositions is not levied against an instrumentality of the Federal Government. Fox Film Corp. v. Doyal, 286 U.S. 123, 52 S.Ct. 546, 76 L.Ed. 1010.

All parties to these actions concede Chapter 177 is a revenue measure. Plaintiffs' attack upon it is based upon the contention that it violates the Fourteenth Amendment of the Federal Constitution in that it lacks uniformity. This statute places a 25 per cent tax upon all persons, firms or corporations, other than the original composer, dealing in the licensing of the right of reproduction of copyrighted articles. The equal protection clause of the Fourteenth Amendment does not prevent a state from classifying business for taxation or impose any iron rule of equality. Classification is not discrimination. It is enough that those in the same class be treated with equality. Caskey Baking Co. v. Virginia, 313 U.S. 117, 61 S.Ct. 881, 85 L.Ed. 1223. Even though there are inequalities, they infringe no constitutional limitation if they result merely from the singling out of one particular class for taxation. Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 57 S.Ct. 868, 81 L.Ed. 1245, 109 A.L.R. 1327. The court must presume that legislation distinctions have been made on a rational basis if there is any conceivable state of facts which would support it. In the absence of the record of the consideration which moved the legislature to enact laws, the court does not presume that the legislature was not aware of facts which afforded reasonable basis for its action. Rast v. Van Deman and Lewis Company, 240 U.S. 342, 36 S.Ct. 370, 60 L.Ed. 679, L.R.A.1917A, 421, Ann.Cas.1917B, 455. Plaintiffs complain that the meaning of the words in this statute is difficult of ascertainment in that the term original composer is used and no mention is made of original author. As was pointed out by the Supreme Court in Watson v. Buck, 313 U.S. 387, 61 S.Ct. 962, 967, 85 L.Ed. 1416, 136 A.L.R. 1426, the State Supreme Court, which under our dual system of government has the last word on the construction and meaning of statutes of the State, has never yet passed upon the statute now

before the court. "It is highly desirable that it should have an opportunity to do so." Watson v. Buck, supra.

The same situation which confronted the Supreme Court in reference to the Florida statute confronts this court here. "The Constitution * * * does not demand of states strict observance of rigid categories nor precision of technical phrasing in their exercise of the most basic power of government, that of taxation. For constitutional purposes the decisive issue turns on the operating incidence of a challenged tax." State of Wisconsin v. J. C. Penney Company, supra, 311 U.S. page 444, 61 S.Ct. page 249, 85 L.Ed. 267, 130 A.L.R. 1229. "It is inherent in the exercise of the power to tax that a state be free to select the subjects of taxation and to grant exemptions." Carmichael v. Southern Coal and Coke Company, supra [301 U.S. 495, 57 S.Ct. 872, 81 L.Ed. 1245, 109 A.L.R. 1327]. Any classification of taxation is permissible which has reasonable relationship to a legitimate end of governmental action. Taxation is but the means by which the Government distributes the burden of its costs among those who enjoy its benefits. Welch v. Henry, 305 U.S. 134, 144, 59 S.Ct. 121, 83 L.Ed. 87, 118 A. L.R. 1142. Even though the classification results in narrow distinctions, these distinctions, if reasonably related to the object of the legislation, are sufficient to justify the classification. New York Rapid Transit Corp. v. City of New York, 303 U.S. 573, 578, 58 S.Ct. 721, 82 L.Ed. 1024. "The rule of equality permits many practical inequalities. * * * What satisfies this equality has not been, and probably never can be, precisely defined." Magoun v. Illinois Trust and Savings Bank, 170 U.S. 283, 18 S.Ct. 594, 599, 42 L.Ed. 1037. In determining the basis for classification, the legislature is entitled to take into consideration that the enjoyment of special franchises and freedom from competition are points of distinction from other businesses. New York Rapid Transit Corp. v. City of New York, supra, 303 U.S. page 579, 58 S.Ct. 721, 82 L.Ed. 1024. "Freedom from unlimited, direct, private competition is of itself a sufficient advantage over ordinary businesses to warrant the imposition of a heavier tax burden." New York Rapid Transit Corp. v. City of New York, supra, 303 U.S. page 580, 58 S.Ct. page 725. Gross receipts from an occupation constitutes an appropriate measure of the privilege of engaging in that occupation. Western Live Stock v. Bureau of Revenue, 303 U.S. 250, 58 S.Ct. 546, 82 L.Ed. 823, 115 A.L.R. 944. The mere fact that the rate of the tax may discourage or even prevent the operation of a business within the field of the taxing authority will not justify the court in striking down the taxing act. Alaska Fish Salting and By-Products Company v. Smith, 255 U.S. 44, 48, 41 S.Ct. 219, 65 L.Ed. 489; Magnano v. Hamilton Co., 292 U.S. 40, 54 S.Ct. 599, 78 L.Ed. 1109.

By Chapter 177, the Legislature of Wisconsin classified businesses in which a person, firm, association or corporation other than the true or original composer, directly or indirectly, issued licenses or other agreements for the purpose of rendition of copyrighted musical numbers. With the exception of the exempt original composer, all persons dealing in the licensing to others are included within the classification. There can be no question but that the exemption of the original composers is so reasonable as to refute the argument of non-uniformity. As plaintiffs point out in their brief, for the original composer to engage in the licensing business in each of the separate states would impose upon him considerable expense. To say that when the composers pool their productions and avoid duplication of expense the State has no right to tax that advantage which it permits is to demonstrate a complete unawareness of the practicalities of the situation. Chapter 177 does not prevent either the original composer or his assignee or agent from making full use of the protection of the copyright law in the State of Wisconsin. All that the Wisconsin Legislature has said is that if the composers see fit to farm out their licensing power they must collectively contribute to the costs of operation of the government of the State. There is a decided advantage to the composers, authors and publishers derived from this farming out and pooling process. By so doing, they gain the advantage of an absolute monopoly in the field which they cover. As was pointed out by Mr. Justice Black in Gibbs v. Buck, 307 U.S. 66, 59 S.Ct. 725, 733, 83 L.Ed. 1111: "This combination apparently includes practically all (probably 95%) American and foreign copyright owners controlling rendition of copyrighted music for profit in the United States. Not only does this combination fix prices.

through a self-perpetuating board of twenty-four directors, but its power over the business of musical rendition is so great that it can refuse to sell rights to single compositions, and can, and does require purchasers to take, at a monopolistically fixed annual fee, the entire repertory of all numbers controlled by the combination." It was further pointed out in Buck v. Swanson, D.C., 33 F.Supp. 377, 386: "Of the popular music necessary for the successful operation of radio stations, dance halls, hotels and theaters, the society has control of about 85% or 90%. It also has control of from 50% to 75% of the standard or older music that is played occasionally." While the mechanics of the operation of Ascap are undoubtedly far afield from what was envisioned by the framers of the constitution (See Madison in the Federalist, XLIII) or by the Congress at the time of the adoption of the Copyright Act of 1909 (See Report, House of Representatives, 66th Congress, Second Session, No. 2222) it is not within the reach of this decision to pass upon the propriety or impropriety of Ascap's method of operation. I could not properly approach consideration of the constitutional implications involved with any prejudice against Ascap because of its monopolistic tendencies. I have not done so. The question of monopoly is important here only because of the definite recognition by the Supreme Court in New York Rapid Transit Corp. v. City of New York, supra, of the duty of considering freedom from competition as a ground for the imposition of a heavier tax burden.

There is no merit in plaintiffs' contention concerning the hardships involved in furnishing the information required in connection with the application for a license. It may be that some of the information involved in the questionnaire is unnecessary. Nonetheless, everyone of the six items bears a direct relationship to the method of operation of the business within the State and the ascertainment of the amount of tax due to the State. The furnishing of the information therein required is no more onerous than that required under regulations of numerous Federal and State taxing agencies. The presence or absence of the requirements concerning information bear no relationship to the fundamental problem as to the constitutionality of the tax. I cannot agree with plaintiffs' contention that Chapter 177 must be ignored by me as a nullity on constitutional grounds.

What I have said concerning the refusal to grant equitable relief to the plaintiffs has equal application to the affirmative relief prayed for by the defendants. They, too, are violating a statute. I feel no more inclination to place the blessing of equity upon them than I do upon the plaintiffs. The only attractive argument which defendants present is that the granting of injunctive relief against the plaintiffs on behalf of all of the tavern operators in the State of Wisconsin will prevent a multiplicity of suits. I am satisfied that defendants' fears in this regard are unfounded. I have no doubt that this case will find its way to a higher court or courts, the decision or decisions of which will determine the correctness or incorrectness of my conclusions with finality. I cannot conceive that, in the meantime, either these plaintiffs or Ascap will be wasting filing fees and expense money simply for the purpose of duplicating the record which has here been made.

The prayers for relief of both the plaintiffs and defendants are denied.