## WATSON, ATTORNEY GENERAL OF FLORIDA, ET AL. *v.* BUCK ET AL.*

No. 610.   Argued April 29, 30, 1941.—Decided May 26, 1941.

*Together with No. 611, *Buck et al.* v. *Watson, Attorney General of Florida, et al.*, also on appeal from the District Court of the United States for the Northern District of Florida.

388

Messrs. *Thomas G. Haight* and *Frank J. Wideman,* with whom Messrs. *Louis D. Frohlich, Herman Finkelstein,* and *Manley P. Caldwell* were on the brief, for appellees in No. 610 and appellants in No. 611.

390

392

*Messrs. Lucien H. Boggs* and *Tyrus A. Norwood,* Assistant Attorney General of Florida, with whom *Messrs J. Tom Watson,* Attorney General, and *Andrew W. Bennett* were on the brief, for appellants in No. 610 and appellees in No. 611.

MR. JUSTICE BLACK delivered the opinion of the Court.

In broad outline, these cases involve the constitutionality of Florida statutes regulating the business of persons holding music copyrights and declaring price-fixing combinations of "authors, composers, publishers, [and] owners" of such copyrights to be illegal and in restraint of trade.

The American Society of Composers, Authors and Publishers (ASCAP), one of the appellants in No. 611 and one of the appellees in No. 610, is a combination which controls the performance rights of a major part of the available supply of copyrighted popular music. The other appellants in No. 611 (appellees in No. 610) are individual composers, authors and publishers of music controlled by ASCAP. The appellees in No. 611 (appellants in No. 610) are the Attorney General and all the state prosecuting attorneys of Florida, who are charged with the duty of enforcing certain parts of the statutes in question.

These two cases were originally a single action, in which ASCAP and its co-parties sought to enjoin the state officials from enforcing a 1937 Florida statute.[1] A

---

[1] Fla. Laws 1937, ch. 17807.

federal district court, composed of three judges under § 266 of the Judicial Code, granted a temporary injunction, and this Court affirmed without passing upon the merits of the constitutional questions involved. *Gibbs* v. *Buck,* 307 U. S. 66. A supplemental bill of complaint was then filed, asking that the three-judge court enjoin a 1939 Florida statute relating to the same subject.[2] On final hearing, the three-judge court again enjoined the state officials from enforcing any part of the 1937 statute, but granted the injunction only as to certain sections of the 1939 act. 34 F. Supp. 510. No. 611 is an appeal by ASCAP and its co-complainants from the refusal to enjoin the state officials from enforcing the remainder of the 1939 act. No. 610 is an appeal by the state officials from the order granting the injunction as to the 1937 act and as to certain sections of the 1939 act.

The court below, without passing at all upon the validity of thirteen out of the twenty-one sections and subsections of the 1937 act, held that the remaining eight sections deprived copyright owners of rights granted them by the federal copyright laws, and that the statute must fall in its entirety. This it did upon the premise that the sections held invalid and the other parts of the bill were intended by the Florida legislature to form "a harmonious whole" and to "stand or fall together." The ultimate questions involved are such that we must first determine whether this ruling was correct. We hold that it was not, for the following reasons.

The Florida legislature expressed a purpose directly contrary to the District Court's finding. For what the legislature intended in this regard was spelled out in § 12 of the Act in the clear and emphatic language of the legislature itself. That section reads:

. "If any section, sub-section, sentence, clause or any part of this Act, is for any reason, held or declared to be

---

[2] Fla. Laws 1939, ch. 19653.

unconstitutional, imperative [sic] or void, such holding or invalidity shall not affect the remaining portions of this Act; and it shall be construed to have been the legislative intent to pass this Act without such unconstitutional, inoperative or invalid part therein; and, the remainder of this Act, after the exclusion of such part or parts, shall be held and deemed to be valid as if such excluded parts had not been included herein."

This is a flat statement that the Florida legislature intended that the act should stand and be enforced "after the exclusion of such part or parts" as might be held invalid. Unless a controlling decision by Florida's courts compels a different course, the federal courts are not justified in speculating that the state legislature meant exactly the opposite of what it declared "to have been the legislative intent." But the Supreme Court of Florida recognizes and seeks to carry out the legislative intent thus expressed. Speaking of a similar severability clause of another statute, that court said: "The Act as a whole evinces a purpose on the part of the Legislature to impose a license tax on chain stores and Section fifteen provides that if any section, provision or clause thereof, or if the Act as applied to any circumstance, shall be declared invalid or unconstitutional such invalidity shall not affect other portions of the Act held valid nor shall it extend to other circumstances not held to be invalid. Under the liberal terms of Section fifteen it may be reasonably discerned that the Legislature intended that the Act under review should be held good under any eventuality that did not produce an unreasonable, unconstitutional or an absurd result. . . . The test to determine workability after severance and whether the remainder of the Act should be upheld rests on the fact of whether or not the invalid portion is of such import that the valid part would be incomplete or would cause results not contemplated by the Legisla-

ture." *Louis K. Liggett Co.* v. *Lee,* 109 Fla. 477, 481;
147 So. 463; 149 So. 8. Measured by this test the court
below was in error, for there can be no doubt that § 1
and the other sections upon which the court failed to
pass are complete in themselves; they are not only con-
sistent with the statute's purpose but are in reality the.
very heart of the act, comprising a distinct legislative
plan for the suppression of combinations declared to be
unlawful. For, as pointed out by the court below, the
sections that were not passed on are those which outlaw
combinations to fix fees and prescribe the means whereby
the legislative proscription against them can be made
effective.[3] Since, therefore, that phase of the act which
aimed at unlawful combinations is complete in itself
and capable of standing alone, we must consider it as a
separable phase of the statute in determining whether
the injunction was properly issued against the state.
officials.

As a matter of fact, as the record stands, the right of
ASCAP and its co-complainants to an injunction depends
upon this phase of the statute and is not to be deter-
mined at all by the validity or invalidity of the particu-
lar sections which the court below thought inconsistent
with the Federal Constitution and the copyright laws
passed pursuant to it. The ultimate determinative
question, therefore, is whether Florida has the power it

---

[3] The Court said:

"There remain: Sections 1, 2–C and 3, in effect declaring ASCAP
and similar societies illegal associations, outlawing its arrangements
for license fees, and proscribing and making an offense, attempts to
collect them; Section 7–B making persons, acting for such a com-
bination, agents for it and liable to the penalties of the Act; Sec-
tion 8 fixing the penalties; Section 9 giving the state courts juris-
diction to enforce the Act, civilly and criminally; and Sections 10–A,
10–B, 11–A and 11–B, prescribing procedure under it." 34 F. Supp.
516. With the possible exception of § 3, nowhere in the course of
the opinion were any of these sections held invalid.

exercised to outlaw activities within the state of price-fixing combinations composed of copyright owners. But before considering that question, it is necessary that we explain why we do not discuss, and why an injunction could not rest upon, any other phase of Florida's statutory plan.

Defendants in the injunction proceedings are the state's Attorney General, who is charged with the responsibility of enforcing the state's criminal laws, and all of the state's prosecuting attorneys, who are subject to the Attorney General's authority in the performance of their official duties.[4] Under the statutes before us, it is made the duty of the state's prosecuting attorneys, acting under the Attorney General's direction, to institute in the state courts criminal or civil proceedings. The original bill alleged that the defendants had threatened to—and would, unless restrained—enforce the 1937 statute "in each and all of its terms and the whole thereof, and particularly against these complainants and others similarly situated . . .," and that as a consequence complainants would suffer irreparable injury and damages. The supplemental bill contained similar allegations as to the 1939 act. Both bills were drawn upon the premise that complainants were entitled to an injunction restraining all the state's prosecuting officers from enforc-

---

[4] The Secretary of State and the State Comptroller were added as parties defendant by a "Further Supplemental Bill of Complaint" filed October 19, 1939. The ground given by the complainants for adding parties was that certain duties were imposed on these officials by the 1939 act. The duties, however, required only that certain fees be collected, and not that actions be brought to enforce the law.

In the course of this litigation, Florida has had three Attorneys General. The present Attorney General took office on January 7, 1941, and all the parties have joined in a motion to substitute him as a defendant in place of his predecessor in office. There is no objection to the substitution, and the motion is granted.

ing any single part of either of the lengthy statutes, under any circumstances that could arise and in respect to each and every one of the multitudinous regulations and prohibitions contained in those laws. In their answers, the state's representatives specifically denied that they had made any threats whatever to enforce the acts against complainants or any one else. In their answer to the supplemental bill, however, they said that they would perform all duties imposed upon them by the 1939 act. The findings of the court on this subject were general, and were to the effect that "Defendants have threatened to and will enforce such State Statutes against these Complainants and others similarly situated in the event that such Complainants and others similarly situated refuse to comply with said State Statutes or do any of the acts made unlawful by said State Statutes." It is to be noted that the court did not find any threat to enforce any specific provision of either law. And there is a complete lack of record evidence or information of any other sort to show any threat to prosecute the complainants or any one else in connection with any specific clause or paragraph of the numerous prohibitions of the acts, subject to a possible exception to be discussed later. The most that can possibly be gathered from the meager record references to this vital allegation of complainants' bill is that though no suits had been threatened, and no criminal or civil proceedings instituted, and no particular proceedings contemplated, the state officials stood ready to perform their duties under their oath of office should they acquire knowledge of violations. And as to the 1937 act, the state's Attorney General took the position from the very beginning, both below and in this Court, that under his construction of the earlier act no duties of any kind were imposed upon him and his subordinates except with relationship to prohibited combinations of the type defined in § 1.

Federal injunctions against state criminal statutes, either in their entirety or with respect to their separate and distinct prohibitions, are not to be granted as a matter of course, even if such statutes are unconstitutional. "No citizen or member of the community is immune from prosecution, in good faith, for his alleged criminal acts. The imminence of such a prosecution even though alleged to be unauthorized and hence unlawful is not alone ground for relief in equity which exerts its extraordinary powers only to prevent irreparable injury to the plaintiff who seeks its aid." *Beal* v. *Missouri Pacific Railroad Corp.*, 312 U. S. 45, 49. A general statement that an officer stands ready to perform his duty falls far short of such a threat as would warrant the intervention of equity. And this is especially true where there is a complete absence of any showing of a definite and expressed intent to enforce particular clauses of a broad, comprehensive and multi-provisioned statute. For such a general statement is not the equivalent of a threat that prosecutions are to be begun so immediately, in such numbers, and in such manner as to indicate the virtual certainty of that extraordinary injury which alone justifies equitable suspension of proceedings in criminal courts. The imminence and immediacy of proposed enforcement, the nature of the threats actually made, and the exceptional and irreparable injury which complainants would sustain if those threats were carried out are among the vital allegations which must be shown to exist before restraint of criminal proceedings is justified. Yet from the lack of consideration accorded to this aspect of the complaint, both by complainants in presenting their case and by the court below in reaching a decision, it is clearly apparent that there was a failure to give proper weight to what is in our eyes an essential prerequisite to the exercise of this equitable power. The clear import of this record is that the court below thought that if a federal court finds a many-sided state criminal

statute unconstitutional, a mere statement by a prosecuting officer that he intends to perform his duty is sufficient justification to warrant the federal court in enjoining all state prosecuting officers from in any way enforcing the statute in question. Such, however, is not the rule. "The general rule is that equity will not interfere to prevent the enforcement of a criminal statute even though unconstitutional. . . . To justify such interference there must be exceptional circumstances and a clear showing that an injunction is necessary in order to afford adequate protection of constitutional rights. . . . We have said that it must appear that 'the danger of irreparable loss is both great and immediate'; otherwise the accused should first set up his defense in the state court, even though the validity of a statute is challenged. There is ample opportunity for ultimate review by this Court of federal questions." *Spielman Motor Sales Co.* v. *Dodge,* 295 U. S. 89, 95–96.

Such "exceptional circumstances" and "great and immediate" danger of irreparable loss were not here shown. Tested by this rule, therefore, and with the possible exception of that phase of the statute outlawing Florida activities by combinations declared unlawful in § 1 of the 1937 act (which we shall later consider separately), neither the findings of the court below nor the record on which they were based justified an injunction against the state prosecuting officers.

In addition to the fact that the situation here does not meet the tests laid down in the decided cases, the very scope of these two statutes illustrates the wisdom of a policy of judicial self-restraint on the part of federal courts in suspending state statutes in their entirety upon the ground that a complainant might eventually be prosecuted for violating some part of them. The Florida Supreme Court, which under our dual system of government has the last word on the construction and meaning of statutes of that state, has never yet passed upon

the statutes now before us. It is highly desirable that it should have an opportunity to do so.[5] There are forty-two separate sections in the two acts. While some sections are repetitious, and while other sections are unimportant for present purposes, there are embraced within these two acts many separate and distinct regulations, commands and prohibitions. No one can foresee the varying applications of these separate provisions which conceivably might be made. A law which is constitutional as applied in one manner may still contravene the Constitution as applied in another. Since all contingencies of attempted enforcement cannot be envisioned in advance of those applications, courts have in the main found it wiser to delay passing upon the constitutionality of all the separate phases of a comprehensive statute until faced with cases involving particular provisions as specifically applied to persons who claim to be injured. Passing upon the possible significance of the manifold provisions of a broad statute in advance of efforts to apply the separate provisions is analogous to rendering an advisory opinion upon a statute or a declaratory judgment upon a hypothetical case. It is of course conceivable that a statute might be flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it. It is sufficient to say that the statutes before us are not of this type. Cases under the separate sections and paragraphs of the acts can be tried as they arise—preferably in the state courts. Any federal questions that are properly presented can then be brought here. But

---

[5] Cf., e. g., *Arkansas Corporation Commission* v. *Thompson, ante,* 132, 144; *Railroad Commission of Texas* v. *Pullman Co.,* 312 U. S. 496, 499; *Railroad Commission of Texas* v. *Rowan & Nichols Oil Co.,* 311 U. S. 570, 575; *Thompson* v. *Magnolia Petroleum Co.,* 309 U. S. 478, 483; *Ex parte Baldwin,* 291 U. S. 610, 619; *Gilchrist* v. *Interborough Rapid Transit Co.,* 279 U. S. 159, 207.

at this time the record does not justify our passing upon any part of the statute except, possibly, that phase which prohibits activities in Florida by combinations declared unlawful. While the proof and findings in this regard are not as clear and specific as they might and should be, we nevertheless, under the circumstances of this case, proceed to this ultimate and decisive question.

In the consideration of this case, much confusion has been brought about by discussing the statutes as though the power of a state to prohibit or regulate combinations in restraint of trade was identical with and went no further than the power exercised by Congress in the Sherman Act. Such an argument rests upon a mistaken premise.[6] Nor is it within our province, in determining whether or not this phase of the state statute comes into collision with the Federal Constitution or laws passed pursuant thereto, to scrutinize the act in order to determine whether we believe it to be fair or unfair, conducive to good or evil for the people of Florida, or capable of protecting or defeating the public interest of the state.[7] These questions were for the legislature of Florida and it has decided them. And, unless constitutionally-valid federal legislation has granted to individual copyright owners the right to combine, the state's power validly to prohibit the proscribed combinations cannot be held non-existent merely because such individuals can pre-

---

[6] We have been referred to a recent consent decree against ASCAP in the federal district court for the Southern District of New York, the theory being that the decree might have some bearing upon the state's power to pass the legislation now under attack. But it has not. In matters relating to purely intrastate transactions, the state might pass valid regulations to prohibit restraint of trade even if the federal government had no law whatever with reference to similar matters involving interstate transactions.

[7] The court below concluded as a matter of law that "enactment of the said Statute was not necessary to protect, nor does it serve the public interest of the State of Florida. . . ."

serve their property rights better in combination than they can as individuals. We find nothing in the copyright laws which purports to grant to copyright owners the privilege of combining in violation of otherwise valid state or federal laws. We have, in fact, determined to the contrary with relation to other copyright privileges.[8] But complainants urge that there is a distinction between our previous holdings and the question here. This contention is based on the idea that Congress has granted the copyright privilege with relation to public performances of music, and that with reference to the protection of this particular privilege, combination is essential. We are therefore asked to conclude from the asserted necessities of their situation that Congress intended to grant this extraordinary privilege of combination. This we cannot do. We are pointed to nothing either in the language of the copyright laws or in the history of their enactment to indicate any congressional purpose to deprive the states, either in whole or in part, of their long-recognized power to regulate combinations in restraint of trade. Compare *Waters-Pierce Oil Co.* v. *Texas* (No. 1), 212 U. S. 86, 107.

Under the findings of fact of the court below, ASCAP comes squarely within the definition of the combinations prohibited by § 1 of the 1937 act. Section 1 defines as an unlawful combination an aggregation of authors, composers, publishers, and owners of copyrighted vocal or instrumental musical compositions who form any society, association, or the like, and the members of which constitute a substantial number of the persons, firms or corporations within the United States who own or control such musical compositions, and "when one of the objects of such combination is the determination and fix-

---

[8] *Interstate Circuit, Inc.* v. *United States*, 306 U. S. 208. Cf. *Fashion Originators' Guild of America* v. *Federal Trade Commission*, 312 U. S. 457; *Ethyl Gasoline Corp.* v. *United States*, 309 U. S. 436.

ation of license fees or other exactions required by such combination for itself or its members or other interested parties." Section 8 of the 1937 act makes it an offense for such combinations "to act within this State in violation of the terms of this Act." The court below found that there were 1425 composers and authors who were members of ASCAP; that the principal music publishers of the country are members; that the Society controls the right of performance of 45,000 members of similar societies in foreign countries; and that the Board of Directors of ASCAP have "absolute control over the fixing of prices to be charged for performance licenses . . ." Since under the record and findings here ASCAP is an association within the meaning of § 1 of the 1937 act, we are not called upon at its instance to pass upon the validity of other provisions contained in the numerous clauses, sentences, and phases of the 1937 or 1939 act which might cover other combinations not now before us. It is enough for us to say in this case that the phase of Florida's law prohibiting activities of those unlawful combinations described in § 1 of the 1937 act does not contravene the copyright laws or the Federal Constitution; that particular attacks upon other specified provisions of the statutes involved are not appropriate for determination in this proceeding; that the court below erred in granting the injunction; and that the bill should have been dismissed. All other questions remain open for consideration and disposition in appropriate proceedings. For the reasons given, the judgment below in No. 610 is reversed and the cause is remanded to the lower court with instructions to dismiss the bill. The judgment in No. 611 is affirmed.

*No. 610 reversed.*
*No. 611 affirmed.*

MR. JUSTICE MURPHY took no part in the consideration or decision of this case.