HEATH CONSULTANTS, INC., APPELLEE, V. PRECISION INSTRUMENTS, INC., APPELLANT, AND KATHERINE WALDMANN AND TIM WALDMANN, AS INDIVIDUALS, APPELLEES.

527 N.W.2d 596

Filed January 27, 1995.   No. S-93-412.

Jeffrey A. Silver for appellant.

Dan H. Ketcham and Amy Sherman LaFollette, of Hansen, Engles & Locher, P.C., for appellee Heath Consultants.

HASTINGS, C.J., WHITE, CAPORALE, LANPHIER, and WRIGHT, JJ., and GRANT, J., Retired, and HOWARD, D.J., Retired.

CAPORALE, J.

## I. STATEMENT OF CASE

Through its counterclaim, the defendant–appellant, Precision Instruments, Inc., asserts that it has been damaged as the result of the unlawful anticompetitive and monopolistic restraint of trade or commerce practiced by the plaintiff–appellee, Heath Consultants, Inc. Concluding that the record failed to so establish, the district court sustained Heath's motion for summary judgment and dismissed Precision's counterclaim. Precision appealed to the Nebraska Court of Appeals, assigning the ruling as error. We, on our own motion, removed the matter to this court in order to regulate the caseloads of the two appellate tribunals. We now reverse the judgment of the district court and remand the cause for further proceedings consistent with this opinion.

## II. SCOPE OF REVIEW

Summary judgment is to be granted only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *First Nat. Bank in Morrill v. Union Ins. Co.*, 246 Neb. 636, 522 N.W.2d 168 (1994).

## III. FACTS

Heath is a Delaware corporation in the business of manufacturing, selling, and repairing leak detection equipment primarily used by the utilities industry. It maintains its principal office in Massachusetts, its operations and manufacturing headquarters in Texas, and its repair facilities in California, Massachusetts, Pennsylvania, and Texas. Until sometime in 1989, it also maintained an office in Omaha. The record further establishes that Heath operates in at least a 15–state area extending from the Mexican border to the Canadian border and

from Hawaii and Alaska to the Missouri River.

Precision is an Iowa corporation in the business of repairing leak detection equipment, maintaining its office in Iowa. Both corporations service customers in Nebraska and have Nebraska customers in common, which include Precision's two largest accounts.

Precision claims that because Heath is the exclusive manufacturer and distributor of the equipment bearing its name and because it refuses to sell replacement parts for use in repairs to be made by Precision, Precision cannot repair Heath equipment and is thereby damaged.

Precision can replicate some of Heath's parts by reference to Heath schematics, which Precision has obtained from a variety of sources, and the use of generic components. However, other Heath parts cannot be replicated either because the particular parts are specific to Heath or because the specifications require the use of the manufacturers' parts. Moreover, a number of parts specific to Heath are not interchangeable with parts made by other manufacturers.

Precision ordered parts from Heath in order to make repairs on three separate occasions. Apparently because of an inadvertent error, Heath sent Precision all the parts requested on the first order. However, Heath sent only some of the parts that Precision requested on its second order and failed to send any of the items that Precision requested on its third order.

Heath advised Precision that it would not supply Precision with parts until the litigation between them was resolved. However, Heath admits that its policy is to sell parts only to end users of its equipment and that the repair service market for Heath equipment is limited because of Heath's control of the parts.

Nonetheless, Heath contends that several competitors exist which are capable of repairing Heath equipment and that end users of its equipment can obtain parts to repair their own equipment, employ Heath's repair service, or employ any other repair service.

At times, Precision has been able to obtain Heath parts through end users of Heath equipment. However, on one occasion, Heath failed to fill a parts order for an Iowa end user

which wanted to avail itself of Precision's repair service. At least one of the parts could not be duplicated; ultimately, Precision sent the equipment to a Heath repair center. Although the record does not expressly explain Heath's refusal to send parts to the end user, it does contain a letter in which the end user advised Heath that it elected to employ Precision rather than Heath because Precision had submitted a lower bid.

·A Michigan repair service which has access to Heath parts and advertises the repair of Heath equipment also refused to sell Heath parts to Precision. The repair service indicated, however, that it would repair Heath equipment for Precision.

## IV. ANALYSIS

Precision relies on Nebraska's unlawful restraint of trade act, Neb. Rev. Stat. §§ 59–801 through 59–831 (Reissue 1993). Section 59–801 provides:

> Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, within this state, is hereby declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy shall be deemed guilty of a Class IV felony.

Section 59–802 reads: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce, within this state, shall be deemed guilty of a Class IV felony."

In addition to imposing criminal penalties, the act provides for the recovery of damages by one injured as the result of forbidden or unlawful conduct. § 59–821.

Precision's position, in essence, is that although there is no formal written agreement between Heath and its end users requiring the latter to purchase parts and service only from Heath, Heath's policies nonetheless create such a tying arrangement, which results in the unlawful restraint and monopolization of trade or commerce.

### 1. TYING ARRANGEMENT

Section 59–829 declares: "When any provision of . . . Chapter 59 is the same as or similar to the language of a federal

antitrust law, the courts of this state in construing . . . any provision of Chapter 59 shall follow the construction given to the federal law by the federal courts."

Assuming without deciding that this provision raises no distribution of powers issue, the legal reality is that with or without that statutory provision, federal cases interpreting federal legislation which is nearly identical to the Nebraska act constitute persuasive authority. Having rendered no prior decisions concerning tying arrangements, we look to federal law for guidance, at the least.

### (a) Existence of Arrangement

A tying arrangement has been defined as an agreement by a party to sell one product, but only on the condition that the buyer also purchase a different, or tied, product, or at least agree that it will not purchase that product from another supplier. *Northern Pac. R. Co. v. United States*, 356 U.S. 1, 78 S. Ct. 514, 2 L. Ed. 2d 545 (1958). A tying arrangement " 'need not be expressly embodied in written contracts. Such arrangements may be deduced from a course of conduct.' " *Associated Press v. Taft-Ingalls Corporation*, 340 F.2d 753, 765 (6th Cir. 1965), *cert. denied* 382 U.S. 820, 86 S. Ct. 47, 15 L. Ed. 2d 66. Accord *Osborn v. Sinclair Refining Company*, 286 F.2d 832 (4th Cir. 1960), *cert. denied* 366 U.S. 963, 81 S. Ct. 1924, 6 L. Ed. 2d 1255 (1961).

Although Heath professes its willingness to sell parts to its end users for repairs to be made either by the user or any repair service the user desires, it may be inferred from the instance in which Heath refused to deliver parts for repairs to be made by Precision that Heath does not always act as it claims.

To the contrary, the record reasonably supports an inference that Heath compels its end users who do not wish to make repairs themselves to resort either to Heath's repair services or to one or more particular non–Heath service providers. Thus, the record reasonably supports an inference that there exists a tying arrangement or contract requiring that in order to obtain parts, purchasers of Heath equipment either perform their own repairs or purchase Heath repair services or a repair service specified by Heath.

(b) Unlawful Nature of Arrangement

Not unlike § 59–801, the Sherman Antitrust Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1 (1988). Section 2 of the act, much like § 59–802, declares: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . ." 15 U.S.C. § 2.

A tying arrangement violates § 1 of the Sherman Antitrust Act if the seller has " 'appreciable economic power' " in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market. *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 462, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992). See *Fortner Enterprises v. U. S. Steel*, 394 U.S. 495, 89 S. Ct. 1252, 22 L. Ed. 2d 495 (1969), *appeal after remand* 452 F.2d 1095 (6th Cir. 1971), *cert. denied* 406 U.S. 919, 92 S. Ct. 1773, 32 L. Ed. 2d 119 (1972). Therefore, a plaintiff alleging an unlawful tying arrangement must produce some evidence of the following elements: (1) the existence of two distinct products or services; (2) sufficient economic power on the part of the defendant in the tying market to appreciably restrain competition in the tied product market, combined with the exercise of such power to coerce the purchaser to buy both items; and (3) that the amount of commerce affected is not insubstantial. See *Eastman Kodak Co., supra*. (It should perhaps be noted at this point that although the U.S. Supreme Court has approved several elements of this test, it has never articulated a complete test of its own. The circuit courts have assembled their tests from various statements contained in different Supreme Court opinions. These courts have developed a five–part test; however, some circuits combine some of the elements to consider a three–part test. In operation, the tests are virtually identical in that both require that (1) there must be separate tying and tied products, (2) there must be evidence of actual coercion by the seller that in fact forced the buyer to accept the tied product, (3) the seller

must possess sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product, (4) there must be anticompetitive effects in the tied market, and (5) there must be involvement of a not insubstantial amount of interstate commerce in the tied product market. Herbert Hovenkamp, Federal Antitrust Policy: The Law of Competition and Its Practice § 10.1 (1994).)

The recent case of *Eastman Kodak Co., supra*, in which the U.S. Supreme Court affirmed the reversal of a summary judgment to Eastman Kodak, provides helpful insight as to the analysis to be used here. The record therein established that Eastman Kodak manufactured and sold high-volume photocopiers and also sold replacement parts and service for its equipment, some of which were produced by Eastman Kodak and others of which were made by outside fabricators. Eastman Kodak parts were not interchangeable with parts made by other copying equipment manufacturers. In the early 1980's, independent service organizations began servicing Eastman Kodak equipment.

Eastman Kodak did not sell a complete system of machines, lifetime service, and lifetime parts for a single price. Instead, it provided service after the initial warranty period either on a per-call basis or through annual service contracts which included all necessary parts. Eastman Kodak negotiated different prices with its customers and provided 80 to 95 percent of the service required by its machines.

Some of the independents' customers purchased their own parts and hired the independents for service only. Others chose the independents to supply both parts and service. The independents kept an inventory of parts which they purchased from Eastman Kodak, outside manufacturers of original Eastman Kodak equipment, parts brokers, or Eastman Kodak customers. In other instances, the independents stripped used Eastman Kodak equipment for parts.

Eastman Kodak later implemented a policy of selling replacement parts for its machines only to buyers of its equipment who either repaired their own machines or used Eastman Kodak service. In addition, Eastman Kodak sought to limit the independents' access to other sources of its parts.

Eastman Kodak and the outside fabricators of its original equipment agreed that the latter would not sell parts that fit Eastman Kodak equipment to anyone other than Eastman Kodak. Eastman Kodak also pressured its equipment owners and parts brokers not to sell Eastman Kodak parts to the independents. In addition, Eastman Kodak took steps to restrict the availability of its used machines. As a result, the independents sued Eastman Kodak, alleging that it had, among other things, unlawfully tied the sale of service for its machines to the sale of parts, in violation of § 1 of the Sherman Antitrust Act, and had unlawfully monopolized and attempted to monopolize the sale of parts and service for such machines, in violation of § 2 of the act.

With *Eastman Kodak Co.* in mind, we turn our attention to the three elements of an unlawful tying arrangement set forth earlier. First, service and parts must be such that they can be considered to be two distinct products. In order to be such, there must be sufficient consumer demand that it is feasible for a seller to provide one separately from the other. *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 104 S. Ct. 1551, 80 L. Ed. 2d 2 (1984). The *Eastman Kodak Co.* Court concluded that because service and parts had been sold separately to self–service owners, the two were separate and distinct products. Here, Heath sold service and parts separately to its end users. In addition, Heath testified that others compete with Heath to repair its equipment, a matter further illustrated by the fact the Michigan repair service has access to Heath parts notwithstanding that it is not an end user. Thus, the record reasonably raises an inference that Heath service and parts are two distinct products.

Second, Heath must be shown to have sufficient economic power over parts and repairs as to appreciably restrain competition in that market and be shown to have exercised that power so as to coerce purchasers to buy both items from it.

"Appreciable economic power" in the tying market concerns market power, which is the power "to force a purchaser to do something that he would not do in a competitive market." *Jefferson Parish Hospital Dist. No. 2*, 466 U.S. at 14. Market power is " 'the ability of a single seller to raise price and

restrict output.' " *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 464, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992). Accord *Fortner Enterprises v. U. S. Steel*, 394 U.S. 495, 89 S. Ct. 1252, 22 L. Ed. 2d 495 (1969), *appeal after remand* 452 F.2d 1095 (6th Cir. 1971), *cert. denied* 406 U.S. 919, 92 S. Ct. 1773, 32 L. Ed. 2d 119 (1972). The existence of such power ordinarily is inferred from the seller's possession of a predominant share of the market. *Jefferson Parish Hospital Dist. No. 2, supra*.

The evidence is that Heath is the only manufacturer of Heath parts. While there is evidence that some of these parts may be replicated through the configuration of generic parts, some repair work cannot be accomplished without buying Heath assemblies, and the record demonstrates that Heath has exercised its power so as to coerce its end users to purchase Heath service.

Moreover, the *Eastman Kodak Co.* Court concluded it was not significant that there are other makers of photocopying equipment. There is no immutable physical law, no basic economic reality, insisting that competition in the equipment market cannot coexist with market power in the aftermarkets. *Eastman Kodak Co., supra*. Therefore, competition in Heath's primary or equipment market does not mean that it lacks market power in the parts and service aftermarket. Consequently, the record supports an inference that the second element of an unlawful tying arrangement existed.

Third, the amount of commerce affected must not be insubstantial. Tie-ins are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a not insubstantial amount of interstate commerce is affected. *Northern Pac. R. Co. v. United States*, 356 U.S. 1, 78 S. Ct. 514, 2 L. Ed. 2d 545 (1958). In *Fortner Enterprises, supra*, the U.S. Supreme Court stated that the relevant figure is the total volume of sales tied by the sales policy under challenge, that is, the total amount of sales by all parties affected by the sales policy and not just the portion of the total sales accounted for by the particular plaintiff.

Given the extent of Heath's operation, it cannot be said as a

matter of law that the record does not raise at least an inference that a substantial amount of commerce is involved.

## 2. MONOPOLIZATION

Although the foregoing determination necessarily means that Heath is not entitled to judgment as a matter of law, we, in the interest of completeness, also consider Precision's monopolization claim. It has been held that under the Sherman Antitrust Act, monopolization consists of two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *Eastman Kodak Co., supra*; *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966).

### (a) Relevant Market

The first step in determining whether Heath has monopoly power is to determine the area in which its market share is to be measured. The relevant market has been defined as the "area of effective competition" within which the defendant operates. *Tampa Electric Co. v. Nashville Co.*, 365 U.S. 320, 327, 81 S. Ct. 623, 5 L. Ed. 2d 580 (1961). Accord, *United States v. du Pont & Co.*, 353 U.S. 586, 77 S. Ct. 872, 1 L. Ed. 2d 1057 (1957); *Standard Oil Co. v. United States*, 337 U.S. 293, 69 S. Ct. 1051, 93 L. Ed. 1371 (1949). The objective in defining the relevant market is to identify those that compete with each other in a given product and geographic area in order to determine whether others can effectively constrain the prices of the alleged monopolist. 1 ABA Antitrust Section, Antitrust Law Developments (Third) 198 (1992). See, *Grinnell Corp., supra*; *Tampa Electric Co., supra*; *du Pont & Co., supra*. Normally, the relevant market must be identified in terms of two dimensions: the products or services affected, the relevant product market, and the geographic areas involved, the relevant geographic market. *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962).

The relevant product market is composed of products that have reasonable interchangeability. *United States v. du Pont & Co.*, 351 U.S. 377, 76 S. Ct. 994, 100 L. Ed. 1264 (1956). As

noted earlier, the *Eastman Kodak Co.* Court held that a manufacturer might have substantial market power in the market for its own replacement parts, notwithstanding that it lacked market power in the market for the photocopiers themselves. The Court determined that the relevant product market for antitrust purposes was determined by the choices available to Eastman Kodak equipment owners, reasoning that because service and parts for Eastman Kodak equipment are not interchangeable with other manufacturers' service and parts, the relevant market from the Eastman Kodak equipment owners' perspective is composed of only those companies that service Eastman Kodak machines. The Court noted that a " 'market is composed of products that have reasonable interchangeability.' " 504 U.S. at 482. Therefore, the *Eastman Kodak Co.* Court concluded that the proper market definition in that case could be determined only after a factual inquiry into the " 'commercial realities' " faced by consumers. *Id.*

The relevant geographic market is the geographic area in which sellers of the particular product or service operate and to which purchasers can practicably turn for such products or services. *Tampa Electric Co., supra.*

> The criteria to be used in determining the appropriate geographic market are essentially similar to those used to determine the relevant product market. . . . Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one. The geographic market selected must, therefore, both "correspond to the commercial realities" of the industry and be economically significant. Thus, although the geographic market in some instances may encompass the entire Nation, under other circumstances it may be as small as a single metropolitan area.

*Brown Shoe Co.*, 370 U.S. at 336–37.

The record implies that Heath is the only supplier of specific Heath assemblies necessary for the repair of Heath equipment throughout the nation. If only Heath equipment owners who agree to use Heath's repair service or a repair service Heath designates are able to get parts to complete the repair, Heath is the only market participant.

(b) Acquisition and Maintenance of Monopoly Power

By far the major factor in determining the existence of monopoly power, once the relevant market has been established, is the percentage of the share of that market maintained by a party. Monopoly power under § 2 of the Sherman Antitrust Act requires something greater than market power under § 1. See *Fortner Enterprises v. U. S. Steel*, 394 U.S. 495, 89 S. Ct. 1252, 22 L. Ed. 2d 495 (1969), *appeal after remand* 452 F.2d 1095 (6th Cir. 1971), *cert. denied* 406 U.S. 919, 92 S. Ct. 1773, 32 L. Ed. 2d 119 (1972). Generally, market shares in the upper brackets have been the basis for finding monopoly power. See, *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966) (87 percent); *United States v. United Shoe Machinery Corp.*, 110 F. Supp. 295 (D. Mass. 1953), *affirmed* 347 U.S. 521, 74 S. Ct. 699, 98 L. Ed. 910 (1954) (75 percent); *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945) (90 percent).

In *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992), the independents presented evidence that Eastman Kodak controlled nearly 100 percent of the parts market and 80 to 95 percent of the service market, with no readily available substitutes. Similarly, in the instant case, Precision has produced evidence that Heath is the exclusive manufacturer for some Heath parts that cannot be replicated. Therefore, with regard to some parts, Heath has 100 percent of the parts market.

Although there may be other repair organizations capable of servicing Heath equipment, without the necessary Heath parts, these organizations offer no competition for the Heath repair centers.

However, monopoly power alone does not establish the offense of monopolization. *Paschall v. Kansas City Star Co.*, 727 F.2d 692 (8th Cir. 1984), *cert. denied* 469 U.S. 872, 105 S. Ct. 222, 83 L. Ed. 2d 152, *reh'g denied* 469 U.S. 1001, 105 S. Ct. 406, 83 L. Ed. 2d 340. But allegations of monopoly power coupled with anticompetitive conduct are sufficient to withstand a motion to dismiss. *Hunt–Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919 (9th Cir. 1980), *cert. denied* 450 U.S. 921, 101 S. Ct. 1369, 67 L. Ed. 2d 348 (1981). A

firm monopolizes when it achieves or maintains monopoly power by a course of deliberate market conduct which has the tendency to keep other firms which might have done so from entering or expanding. Lawrence A. Sullivan, Handbook of the Law of Antitrust § 7 (1977).

The second element of a § 2 claim is the use of monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor . . . ." *United States v. Griffith*, 334 U.S. 100, 107, 68 S. Ct. 941, 92 L. Ed. 1236 (1948). In *Eastman Kodak Co., supra*, the Court found that the independents presented evidence that Eastman Kodak took exclusionary action to maintain its parts monopoly and used its control over parts to strengthen its monopoly share of the Eastman Kodak service market. The *Eastman Kodak Co.* Court therefore determined that liability turned on whether " 'valid business reasons' " could explain Eastman Kodak's actions. 504 U.S. at 483. Accord *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S. Ct. 2847, 86 L. Ed. 2d 467 (1985). See *Aluminum Co. of America, supra*.

Eastman Kodak contended that it had three business justifications for its actions: (1) to promote interbrand equipment competition by allowing Eastman Kodak to stress the quality of its service; (2) to improve asset management by reducing Eastman Kodak's inventory costs; and (3) to prevent the independents from free riding on Eastman Kodak's capital investment in equipment, parts, and service. However, the Court determined that there were triable issues of fact on each of Eastman Kodak's possible justifications. Specifically, the Court noted that Eastman Kodak's willingness to allow self-service cast doubt on its quality control claim.

Although Heath proposed the same justifications for its policy of only selling parts to end users, the record supports the inference that Heath's failure to fill an order for repair parts is a manifestation of its exclusionary action.

### 3. APPLICABILITY OF NEBRASKA ACT

While the ultimate inferences raised by the record disclose genuine factual issues as to the existence of an unlawful tying arrangement and unlawful monopolization of the service and

parts market, there exists a more basic question—whether the unlawful conduct has resulted in the restraint of trade or commerce "within this state." If not, the Nebraska act does not apply.

In that regard, we, a century ago, determined that a company receiving and delivering telegrams in the City of Fremont which were transmitted over lines to and from other points within the state was doing business within the city. *Western Union Telegraph Co. v. City of Fremont*, 39 Neb. 692, 58 N.W. 415 (1894). Similarly, the court in *State v. American Railway Express Co.*, 183 Minn. 244, 236 N.W. 321 (1931), determined that a company originating shipments in Minnesota which, upon crossing the Canadian border, were transferred to a Canadian entity for delivery in Canada was doing business within the State of Minnesota. Under a statute taxing the premiums of foreign insurance companies earned from business done within the commonwealth, the court in *Com. v. Equitable L. A. Soc. of U. S.*, 239 Pa. 288, 86 A. 787 (1913), determined that all premiums received from policyholders residing within the commonwealth were taxable even though paid directly to a home office or agencies outside the commonwealth.

While there is no showing that any of the conduct about which Precision complains occurred within the territorial limits of this state, the record nonetheless inferentially establishes that the tying arrangement affected end users of Heath equipment in Nebraska by denying them the advantage of parts sold in a freely competitive market. Accordingly, the record inferentially establishes that Heath has unlawfully engaged in anticompetitive and monopolistic restraint of trade and commerce within this state and that the Nebraska act applies.

### 4. INTERSTATE IMPLICATIONS

But our review is not yet completed, for there remains the question as to whether, notwithstanding all of the foregoing, the fact that Heath engages in interstate commerce precludes enforcement of the Nebraska act.

It is clear that some applications of state antitrust statutes are not permissible. See, *Connell Co. v. Plumbers & Steamfitters*, 421 U.S. 616, 95 S. Ct. 1830, 44 L. Ed. 2d 418 (1975) (state

antitrust laws used to regulate union activities aiding union organization clearly preempted by federal labor laws); *Flood v. Kuhn*, 443 F.2d 264 (2d Cir. 1971), *aff'd on other grounds* 407 U.S. 258, 92 S. Ct. 2099, 32 L. Ed. 2d 728 (1972) (state's interest in antitrust regulation, when compared with its interest in health and safety regulation, not of particular urgency); *Robertson v. National Basketball Association*, 389 F. Supp. 867 (S.D.N.Y. 1975) (New York antitrust law inapplicable to professional basketball league); *Partee v. San Diego Chargers Football Co.*, 34 Cal. 3d 378, 668 P.2d 674, 194 Cal. Rptr. 367 (1983), *cert. denied* 466 U.S. 904, 104 S. Ct. 1678, 80 L. Ed. 2d·153 (1984) (California Cartwright Act generally concurrent with federal antitrust laws, but inapplicable to National Football League due to burden on interstate commerce of nonuniform state policies); *State v. Milwaukee Braves, Inc.*, 31 Wis. 2d 699, 144 N.W.2d 1 (1966), *cert. denied* 385 U.S. 990, 87 S. Ct. 598, 17 L. Ed. 2d 451 (state antitrust law preempted as to national baseball league); *HMC Management v. New Orleans Basketball Club*, 375 So. 2d 700 (La. App. 1979), *cert. denied* 379 So. 2d 11 (La. 1980) (undue burden on league bars application of Louisiana antitrust law).

However, those cases concern state regulation of national organizations already subject to federal legislation or national governing bodies. The present case concerns private enterprise conducting business within Nebraska. Although the U.S. Supreme Court has not explicitly held that state antitrust statutes may apply to matters involving both intrastate and interstate commerce, it has upheld application of state antitrust laws in cases in which those laws clearly affected interstate commerce. See, *California v. ARC America Corp.*, 490 U.S. 93, 109 S. Ct. 1661, 104 L. Ed. 2d 86 (1989); *U. S. v. Underwriters Assn.*, 322 U.S. 533, 64 S. Ct. 1162, 88 L. Ed. 1440 (1944); *Watson v. Buck*, 313 U.S. 387, 61 S. Ct. 962, 85 L. Ed. 1416 (1941).

Moreover, several lower federal courts have expressly determined that the Commerce Clause of the U.S. Constitution does not necessarily preclude the application of state antitrust laws to interstate commerce. *Shell Oil Co. v. Younger*, 587 F.2d 34 (9th Cir. 1978), *cert. denied* 440 U.S. 947, 99 S. Ct. 1425, 59 L. Ed. 2d 635 (1979); *Woods Exploration & Pro. Co. v.*

*Aluminum Co. of Amer.*, 438 F.2d 1286 (5th Cir. 1971), *cert. denied* 404 U.S. 1047, 92 S. Ct. 701, 30 L. Ed. 2d 736 (1972); *Mathews Conveyer Co. v. Palmer–Bee Co.*, 135 F.2d 73 (6th Cir. 1943).

Indeed, several state courts have reasoned that neither federal antitrust legislation nor the Commerce Clause precludes application of state antitrust laws to all interstate commerce. *Younger v. Jensen*, 26 Cal. 3d 397, 605 P.2d 813, 161 Cal. Rptr. 905 (1980); *State v. Sterling Theatres Co.*, 64 Wash. 2d 761, 394 P.2d 226 (1964); *State v. Southeast Tex. Chap. of Nat. Elec. Con. Ass'n*, 358 S.W.2d 711 (Tex. Civ. App. 1962), *cert. denied* 372 U.S. 969, 83 S. Ct. 1094, 10 L. Ed. 2d 131 (1963); *Peoples Savings Bank v. Stoddard*, 359 Mich. 297, 102 N.W.2d 777 (1960); *State v. Allied Chemical & Dye Corp.*, 9 Wis. 2d 290, 101 N.W.2d 133 (1960); *Commonwealth v. McHugh*, 326 Mass. 249, 93 N.E.2d 751 (1950); *C. Bennett Bldg. Supplies v. Jenn Air*, 759 S.W.2d 883 (Mo. App. 1988); *State v. Coca Cola Bottling Co. of Southwest*, 697 S.W.2d 677 (Tex. App. 1985), *appeal dismissed* 478 U.S. 1029, 107 S. Ct. 9, 92 L. Ed. 2d 764 (1986).

State courts upholding the application of state antitrust law as applied to interstate commerce have reviewed the issue with regard to the test promulgated by the U.S. Supreme Court in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S. Ct. 844, 25 L. Ed. 2d 174 (1970). " 'Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. . . .' " *Coca Cola Bottling Co. of Southwest*, 697 S.W.2d at 681–82. Accord *Pike, supra.*

In *State v. Allied Chemical & Dye Corp., supra*, the Wisconsin Supreme Court held that the fact that the Federal Trade Commission had filed a complaint against defendants who neither owned, operated, nor maintained any manufacturing plant, sales, or other office within the state did not preclude the State of Wisconsin from seeking an injunction against those corporations under the state antitrust statutes. In rejecting the defendants' contention that the Federal Trade

Commission having taken jurisdiction over the business practices in question, the state was precluded from enforcing the state statutes, the Wisconsin Supreme Court reasoned:

> The Wisconsin statutes were enacted in the exercise of the police powers of the state. The public interest and welfare of the people of Wisconsin are substantially affected if prices of a product are fixed or supplies thereof are restricted as the result of an illegal combination or conspiracy. The people of Wisconsin are entitled to the advantages that flow from free competition in the purchase of calcium chloride and other products, and if the state is able to prove the allegations made in its complaint it is apparent that the acts of the defendants deny to them those advantages.

9 Wis. 2d at 295, 101 N.W.2d at 135.

Inasmuch as the Nebraska act is consistent with federal law and there are ultimate inferences that the tying arrangement and monopolization had an impact upon local residents, the burden on interstate commerce cannot, at least at this point, be said to outweigh the interest of this state.

## V. JUDGMENT

Accordingly, as first noted in part I, the judgment of the district court is reversed and the cause remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.

WRIGHT, J., dissenting.

I respectfully dissent. Heath Consultants, Inc., which manufactures leak detection equipment and underground locating equipment, has a policy of selling replacement parts only to end users of its products. Precision Instruments, Inc., has just one employee, a former Heath employee, who repairs leak detection units. Precision is not an end user of Heath products, but on two occasions Precision was permitted to purchase Heath replacement parts. Subsequent orders placed by Precision were refused. It is not disputed that Heath has competitors in the manufacturing and repairing of leak detection equipment or that Precision is one of those competitors.

As the majority points out, to succeed in its claim, Precision must prove that Heath had sufficient economic power over parts and repairs to appreciably restrain competition in the market and that Heath exercised such power to coerce purchasers to obtain both parts and service from Heath. Appreciable economic power in the tying market concerns market power, which is the power to force a purchaser to do something that he would not do in a competitive market. *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 104 S. Ct. 1551, 80 L. Ed. 2d 2 (1984). The existence of such power ordinarily is inferred from the seller's possession of a predominant share of the market. *Id.* The majority defines the relevant market for purposes of this case as being composed of only those companies that can service Heath equipment.

As I review the record, I cannot find any evidence of actions by Heath that would constitute an unlawful tying arrangement. Although Heath has refused to sell replacement parts directly to Precision, there is absolutely no evidence that Heath has refused to sell parts to end users who did not promise to use Heath's repair service or repair services designated by Heath.

Although Katherine Waldmann, Precision's president, testified that she knew of one instance in which Heath had "refused" to sell parts to Midwest Gas, an end user which wanted to use Precision's repair service, she admitted that she was speculating about the end user's dealings with Heath. No evidence was presented as to why the order was not filled. Waldmann testified that she had spoken to a Michigan company, Midwest Instrument Services Corporation, to see if it could repair an item that Precision could not repair. When Waldmann inquired about purchasing parts from Midwest Instrument, she was told that Midwest Instrument did not want to bother with selling parts. Waldmann did not know where Midwest Instrument got its Heath parts, but assumed Midwest Instrument ordered them from Heath. Waldmann did not know whether Midwest Instrument was an authorized Heath distributor. Waldmann had no knowledge of Heath's entering into any kind of agreement with a parts manufacturer not to distribute parts to Precision.

The majority finds it significant that Heath did not ship a part

to Midwest Gas after Midwest Gas sent a letter to Heath stating that Midwest Gas would use Precision's repair services. I fail to see the significance of this occurrence. The letter from Midwest Gas to Heath was dated February 9, 1990. Waldmann stated that the nonshipment occurred during November 1991, 21 months after the letter was sent. Waldmann admitted that she did not know if Midwest Gas contacted Heath regarding the nonshipment, and she did not know why the part was not shipped. There is no evidence that Heath refused other orders from Midwest Gas, nor did anyone positively state that Heath had ever refused to sell a part to Midwest Gas. I cannot conclude that there is a reasonable inference that the letter caused the nonshipment or that the nonshipment creates an inference of an illegal tying arrangement. Therefore, I conclude that there is no reasonable inference that Heath has refused to sell parts to any end user.

The record does not create an inference that Heath conditioned the sale of its parts on an end user's agreement to make such parts unavailable to Precision or any other repair service. Waldmann testified that Precision continued to make repairs on Heath products by having the end users order parts from Heath. Precision was able to obtain many parts through independent manufacturers. Waldmann had encountered no restrictions on the independent manufacturers of Heath parts. Furthermore, Precision has been able to replicate certain Heath schematics.

The majority relies upon *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992), but I do not think that *Eastman Kodak Co.* is applicable to the facts in the case at bar. In *Eastman Kodak Co.*, there was ample evidence that Kodak was carrying on a broad–based campaign to eliminate independent service organizations from the market for repair of Kodak photocopiers. In the case at bar, there is a unilateral refusal to sell parts to one independent service organization. There are neither allegations nor evidence of agreements between Heath and independent parts manufacturers. There is no evidence that Heath pressured its end users to use only Heath repair services. There is no evidence that Heath was discriminating against end

users that used independent service organizations or that Heath was engaging in a broad-based attempt at a tying arrangement or an exclusion of all independent service organizations. Here, the evidence establishes that Heath has several competitors who manufacture leak detection equipment. Precision is able to do some repairs with generic electronic parts, and Precision concedes that it has been able to obtain parts for Heath products from independent parts manufacturers, as well as obtaining Heath parts through end users.

Under the Sherman Antitrust Act, monopolization consists of two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. See *Eastman Kodak Co., supra*. Although Heath is the exclusive manufacturer of some Heath parts that cannot be replicated, and therefore Heath would have 100 percent of that parts market, the refusal to sell such parts to Precision does not create a monopolistic practice on the part of Heath. The fact that only a Heath part can repair Heath equipment, with no further evidence, does not establish that Heath has engaged in monopolistic practices by refusing to sell parts to Precision.

The question becomes: Does Heath's refusal to sell parts to one competitor constitute the existence of monopoly power and the willful acquisition or maintenance of that power? I cannot conclude that one isolated instance supports any such inference of monopolistic behavior on the part of Heath. Therefore, I cannot say that the refusal to sell parts to Precision constitutes a monopolistic practice or an unlawful restraint of trade or commerce within the State of Nebraska.

In my opinion, the facts of this case do not square with the facts in *Eastman Kodak Co*. The facts recited in the majority opinion do not set forth a reasonable inference that Heath's behavior has risen to the level of unlawful anticompetitive and monopolistic restraint of trade. Summary judgment was properly entered in favor of Heath, and I would affirm the decision of the district court.

HOWARD, D.J., Retired, joins in this dissent.